Sterling *v.* Philadelphia, Appellant.

Argued April 21, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Abraham L. Freedman,* City Solicitor, with him *Richard D. Solo* and *Murray L. Schwartz,* Assistant City Solicitors, *Abraham L. Wernick,* Deputy City Solicitor, and *Jerome J. Shestack,* First Deputy City Solicitor, for appellants.

*William Clarke Mason,* with him *Sydney S. Stern,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 28, 1954:

There are two questions involved in this appeal: (1) Does the ordinance of the City of Philadelphia of December 9, 1952, imposing a so-called mercantile license tax, include in its coverage members of the bar engaged in the practice of their profession? (2) If so, is the ordinance unconstitutional as an interference with the judicial branch of government?

The ordinance in question is entitled, "AN ORDINANCE To provide revenue by imposing a mercantile license tax on persons engaging in certain businesses, including manufacturing, professions, occupations, trades, vocations, and commercial activities in the City of Philadelphia; . . . " "Business" is defined as meaning "the carrying on or exercising for gain or profit within the City of Philadelphia of any trade, business, profession, vocation, . . . or of any manufacturing, commercial or financial activity, service or business, . . . ." It is provided that ". . . every person desiring to engage in or to continue to engage in any business shall, . . . in each license year, . . . procure a mercantile license for each of his places of business in the City, from the Department of Licenses and Inspections which shall issue the same upon payment of a fee of three (3) dollars for each place of business in the City." The ordinance, after establishing the rates of the annual tax to be paid by wholesale dealers, dealers who sell both at wholesale and retail, and manufacturers, fixes three (3) mills on each dollar of the annual gross volume of business transacted as the rate to be paid by "all other persons engaged in business." For failure or refusal to procure a mercantile license required under the ordinance there is provided a penalty of fine and of imprisonment in case of default in the payment of the fine.

Plaintiff's complaint sought an injunction against the City and its officials from enforcing against attorneys at law the license and tax provisions of the ordinance. The court below granted the injunction and defendant appeals from its decree.

1. Did the ordinance intend to include in its coverage members of the bar engaged in the practice of their profession?

There are words in the title [1] and in the definitions section of the ordinance that compel an affirmative answer to that question. The title states that the tax is imposed on "certain businesses" but including, inter alia, *professions, occupations* and *vocations*. Then, in Section 1, "business" is defined as the carrying on of "any . . . *profession, vocation,* . . . *service* or business." It would seem plain, therefore, that the intention of the ordinance was to impose the tax, notwithstanding its designation as a "mercantile license tax," on professions, occupations and vocations as well as on mercantile establishments, an intention given strong emphasis by the fact that "business" is defined as carrying on or exercising for gain or profit of any "*service* or business." It is a familiar canon of construction of statutes and ordinances, as indeed of contracts, wills, and other written instruments, that presumably every word, sentence or provision therein is intended for some purpose, and accordingly must be given effect.

It is argued that a so-called "mercantile license tax," merely because of such designation, can be applied only to those engaged in trade or business, but we have frequently held that the name given to a tax

---

[1] The title is part of a statute or ordinance and, as such, must be considered in construing the enactment: *City Stores Co. v. Philadelphia*, 376 Pa. 482, 487, 488, 103 A. 2d 664, 667, and cases there cited.

is far from conclusive in determining its real nature. It is the substance of the law or ordinance, rather than the designation or name given it by the legislative body, that is controlling in that regard: *Flynn v. Horst,* 356 Pa. 20, 27, 29, 51 A. 2d 54, 58; *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 112, 69 A. 2d 405, 407; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 615, 98 A. 2d 182, 187, 188. A legislative body may, in a statute or ordinance, furnish its own definitions of words and phrases used therein in order to guide and direct judicial determination of the intendments of the legislation although such definitions may be different from ordinary usage; it may create its own dictionary to be applied to the particular law or ordinance in question. It was entirely competent, therefore, for the ordinance to include professions in its definition of "businesses" in order to explain the coverage it intended by its use of the latter term. In *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 609, 98 A. 2d 182, 185, it was stated, concerning this same ordinance, that while, ordinarily, mercantile license taxes have been imposed only upon merchants, there was neither law nor reason why a tax, even though so designated, could not be extended to persons otherwise engaged, and it was pointed out that the Acts of May 23, 1949, P. L. 1669, and May 10, 1951, P. L. 265, were in fact almost as broad as this ordinance and defined the word "business" in nearly the same language; also that the Pittsburgh Mercantile License Tax which was the subject of discussion in *Federal Drug Co. v. Pittsburgh,* 358 Pa. 454, 57 A. 2d 849, imposed liability upon persons engaged in many non-mercantile operations. In fact, the appellants in the *National Biscuit Co.* case included insurance agents and brokers, and we held that they were liable for the tax under this ordinance. Nor may it be amiss to add that, in a

broader sense, a professional man "sells" [2] his services for a financial consideration just as a business man sells his merchandise, although his activities are attended, in the case of the lawyer or doctor, with a certain measure of idealistic and altruistic motivations which do not necessarily pertain to the market place.

Plaintiff suggests that what the ordinance contemplated in regard to those engaged in professional activities was that the tax should apply, not to income derived from services rendered, but merely to receipts from sales transactions, if any, incidental to the practice of their professions,—in other words, not to their professional but to their non-professional activities. In support of that proposition plaintiff points to such cases as *Commonwealth v. Lutz*, 284 Pa. 184, 130 A. 410; *Biser's Appeal*, 317 Pa. 190, 176 A. 200; *Commonwealth v. Dinnien*, 320 Pa. 257, 182 A. 542; *Commonwealth v. Pennsylvania Heat & Power Co.*, 333 Pa. 46, 3 A. 2d 412; *Commonwealth v. Miller*, 337 Pa. 246, 11 A. 2d 141, in all of which the tax involved was held to apply to sales of merchandise—fixtures and supplies by a plumber, medicines by a pharmacist, caskets and shrouds by an undertaker, oil burners by a heat and power company, and eyeglasses by an optometrist—but not to apply to the skilled or professional services rendered in connection with those sales. In all those cases, however, the tax was levied under statutes which expressly imposed it only on vendors of, or dealers in, goods, wares and merchandise, and not, as in the present case, also upon those *engaged in professions, occupations and vocations* or rendering *service*. The cases thus relied upon by plaintiff are, therefore, not at all in point.

---

[2] In that connection there comes to mind the phrase attributed to Lincoln and prominently framed in many lawyers' offices, that "A lawyer's time and advice are his stock in trade."

We are, then, clearly of opinion that the ordinance here in question was intended to include those engaged in professions—and therefore lawyers—in its coverage.

2. This brings us to the second question: Is the ordinance, when so construed, unconstitutional as an infringement upon the independence of the judicial branch of government?

Two propositions bearing upon that question are self-evident. One is that the privilege of practicing law carries with it no exemption from the duties of citizenship, including the sharing with all others the expense of government, national, state and municipal; lawyers pay federal income taxes, state personal property taxes, municipal real estate and net profits taxes the same as all other persons. The other proposition is that lawyers are officers of the courts and it is solely from the courts that they derive the authority to practice their profession; the legislative branch of government, whether state or municipal, can neither grant nor revoke such authority, nor prescribe or in any manner interfere with their functions and activities, nor regulate the conduct of their practice. If, therefore, the present ordinance involved any encroachment upon the judiciary it would represent but a vain attempt on the part of the municipal authorities to exercise a power which they do not possess; (*Hoopes v. Bradshaw*, 231 Pa. 435, 487, 80 A. 1098, 1099.). The question, therefore, is whether the tax which it imposes does constitute any such encroachment upon, or interference with the judiciary thereby violating the constitutional separation of power among the three branches of government. In deciding that question we must be careful not to be misled merely by inept terminology. Thus the ordinance requires the payment of a fee of $3.00 for procuring a "mercantile

license." Taken literally, the word "license" would connote the granting of a permission, and, since a mercantile license tax is on the privilege of doing business,[3] it might offhand appear that the obtaining of a license is made a prerequisite or condition for the right of the taxpayer—in this case the lawyer—to continue in the practice of his business or profession. But nothing could be further from the truth, for it is too clear for discussion, and indeed we have definitely held, that the charge of $3.00 is not in fact a "license fee" but a registration charge,—a mere procedural device to establish the identity of those who, by reason of their occupations, are subject to the tax, the $3.00 being merely to cover the clerical expense of the registration and issuance of the license certificate: *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 112, 113, 69 A. 2d 405, 407; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 616, 618 (footnote 4), 98 A. 2d 182, 188, 189. It need scarcely be said that an attorney at law requires no license, other than from the courts, to practice his profession; indeed merchants also, for that matter, have the legal right to conduct their business operations without license by governmental authority save only in the case of certain special businesses which, because of their nature, are subject to the police power, as, for example, the sale of liquor. But the important and indeed the controlling point here is that *a lawyer's right to engage in, or continue to engage in, the practice of his profession is not conditioned upon his procuring the so-called license or*

---

[3] *Commonwealth v. Harrisburg Light & Power Co.,* 284 Pa. 175, 178, 130 A. 412, 413; *Blauner's, Inc. v. Philadelphia,* 330 Pa. 342, 346, 347, 198 A. 889, 892; *Commonwealth v. McKinley-Gregg Automobile Co.,* 345 Pa. 544, 546, 28 A. 2d 919, 920; *Federal Drug Co. v. Pittsburgh,* 358 Pa. 454, 457, 57 A. 2d 849, 850; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 612, 613, 98 A. 2d 182, 186.

*paying the tax imposed by the ordinance, nor is it in any manner regulated or affected thereby;* if he fails or refuses to carry out any of the duties imposed upon him therein the only penalty is that which applies ordinarily to all other tax measures, namely, an entry of judgment and execution against his property, fine and possibly imprisonment for making false or fraudulent statements on a return or wilful default in filing one. In short, the ordinance is purely a revenue measure; it does not interfere with, or seek to exercise any power or authority over, the rights and obligations of the lawyer as an officer of the court or in the pursuance generally of his professional practice; in those respects it nowise differs from all the other taxes which lawyers now pay in common with their fellow citizens. And it may well be asked, What is the practical difference between a revenue tax on income or gross receipts, admittedly valid, and a revenue tax on a privilege measured by that same income or gross receipts?

It would be a work of supererogation to cite the numerous cases in other jurisdictions which, with little if any break in their unanimity, hold that while, *as members of the bar,* their admission to practice and their professional conduct after admission are essentially matters to be regulated by the judiciary department of the government, *as members and citizens, on the other hand, of nation, state and city,* their rights, privileges and immunities, as well as their duty to pay their share of the expenses of government like those of any other citizen, are controlled by the laws and ordinances of the political body of which they are a part and from which they receive protection.[4] The contention that they are exempt from municipal li-

---

[4] *Davis v. Ogden City,* 117 Utah 315, 215 P. 2d 616.

cense, privilege, or occupation taxes has been consistently denied by courts and text writers alike, as shown by the authorities collated in the annotation entitled "Validity of municipal license, privilege, or occupation tax on attorneys" in 16 A.L.R. 2d 1228 et seq. See also 18 L.R.A. 409; 5 Am. Jur. pp. 268, 269; §12; McQuillin, Municipal Corporations, (3rd ed.) volume 9, p. 293, §26.130. In the United States Supreme Court as early as the case of *Royall v. Virginia,* 116 U. S. 572 (1886), a license tax on a lawyer was held to be an occupation tax for which the so-called license was "merely a receipt and not an authority,"— nothing more than a mere form of imposing a tax for revenue and not an exaction for purposes of regulation. The court there said: "In the case of Humphreys v. The City of Norfolk, supra, the Supreme Court of Appeals of Virginia, referring to the previous case of Ould v. City of Richmond, said: 'The objection was made in that case that a power to license involves in its exercise the power to prohibit without such license; and that such power vested in a municipal corporation is incompatible with the rights of attorneys conferred by their general license to practice in any and every part of the State. This objection did not prevail. Judge ANDERSON, upon this point, speaking for the entire court, conceded that the city authorities could not prohibit attorneys at law, already licensed, from practicing their profession within the city limits. The exercise of the vocation was, however, a civil right and privilege, to which are attached valuable immunities and pecuniary advantages, and is a fair subject of taxation by the State and by municipal corporations. . . . 'The principles settled by that case,' continued the court, 'are decisive of this. In neither case is the attempt made to prohibit the exercise of the business or vocation. The license required by the corpora

tion is merely a mode of assessing the tax; if it be reasonable and just, it matters but little by what name it is called.' "

Since the right of the municipality to impose this tax on lawyers is challenged on the ground that it is an invalid interference with their activities as officers of the courts, the charge is somewhat analogous to that long made against the right of the federal government to tax the salaries of state officials. The view originally prevailed that such tax was an unconstitutional encroachment upon the independence of the state government and an interference with its capacity to perform its functions. But in *Graves v. New York ex rel. O'Keefe,* 306 U. S. 466, the United States Supreme Court, taking a more practical view of the problem, reversed the earlier decisions so holding.[5] It is argued that if the municipality be conceded the power to tax members of the bar on the privilege of conducting their professional activities, so great a tax might be imposed as to make it difficult, if not impossible, for them to continue in practice. But, apart from the fact that a similar argument would be equally applicable to all other tax impositions, the famous cliché of Chief Justice MARSHALL in *McCulloch v. Maryland,* 4 Wheat. 316, 431, that "the power to tax involves the power to destroy," questioned by Mr. Justice HOLMES in his dissenting opinion in *Panhandle Oil Co. v. Mississippi ex rel. Knox,* 277 U. S. 218, 223, has been practically abandoned as being an unrealistic legal pronouncement.

Plaintiff makes some attack on the ordinance on the ground that its title is constitutionally defective.

---

[5] Among the cases so reversed was *Collector v. Day,* 11 Wall. 113, which had held that it was not competent for Congress to tax the salary of a judicial officer of a state.

In the *National Biscuit Co.* case, however, we said that such criticisms did not merit serious discussion.

Decree reversed and bill dismissed; each party to bear its own costs.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Justice CLARK of the Supreme Court of the United States, in dissenting from a decision of that Court, observed: "Today's decision twists the law by the tail." * The Majority Opinion in the case at bar goes further; it twists the law by the tail and ties it into a knot.

From time immemorial the law has been regarded as the handmaiden of justice. The Majority today makes it a commodity, an article of merchandise, something sold over the counter by merchants—known as lawyers.

Using an ordinance obviously and manifestly enacted for the purpose of raising money on what is so clearly designated as "certain businesses," the City of Philadelphia, through its Revenue Commissioner and the Commissioner of Licenses and Inspections, attempts to license and, by threatening penalties, harass the legal profession. And this Court, instead of thwarting the unblushing circumvention, places its imprimatur on the bold maneuver.

This dissenting Opinion of mine is not intended as a defense of or apology for the legal profession. It needs no champion and certainly requires the services of no apologist. If the City Government of Philadelphia, in the exercise of its undoubted powers, concludes that attorneys-at-law, in justified categories, shall pay a certain tax on their incomes and legally

———

* *Newspaper Pub. Assn. v. Labor Board,* 345 U. S. 100, 113.

says so, the Philadelphia lawyer will pay the tax unhesitantly, as he meets every other honorable obligation. But to strike at him through the market stall, the grocer's counter and the auctioneer's block is not in keeping with the candor and fair dealing that the lawyer has the right to expect from legal agencies of a municipal government duly elected by the people. And I am satisfied that the legislative branch of the government never intended the Mercantile License Tax Ordinance of December 9, 1952, to apply to lawyers. The stretching of that legislation to reach the legal profession was undoubtedly accomplished on a windlass in the executive department of the city government.

The Majority Opinion, in affirming the City's executive department's action, declares that the scope of the Ordinance encompasses the legal profession because it defines business as including "the carrying on or exercising for gain or profit within the City of Philadelphia of any trade, business, profession, vocation, . . . or of any manufacturing, commercial or financial activity, service or business. ." But the word *profession* here is not given its natural, unhampered, centrifugal expansion. It, together with many other activities, is compressed within the rigid circle of business. Obviously, therefore, the concept of professional activity here intended is that type of professional activity which forms an integral part of business, as, for instance, the business conducted by auctioneers, brokers, pharmacists, all of whom are loosely referred to as "professionals." The drafters of the Ordinance of December 9, 1952, unquestionably knew that, as Webster's Unabridged Dictionary defines it, *profession* is: "the occupation, *if not purely commercial,** me-

---

* Italics throughout, mine.

chanical, agricultural, or the like, to which one devotes oneself; a calling in which one professes to have acquired some special knowledge used by way either of instructing, guiding or advising others of serving them in some art"; and the drafters also knew that *business* intends "mercantile transactions; buying and selling; a commercial or industrial establishment or enterprise."

The subject matter of the Ordinance of December 9, 1952, is clearly business in the mercantile world. The measure is entitled: "An Ordinance to provide revenue by imposing a *mercantile* license tax on persons engaging in certain businesses, including manufacturing, professions, occupations, trades, vocations, and commercial activities in the City of Philadelphia." Section 2 of the Ordinance imposes a *mercantile* license fee; Section 3 exacts a *mercantile* license tax. The touchstone of this entire piece of legislation is the word *mercantile*. What is the definition of mercantile? Let us turn to the dictionaries. The new five volumed Webster's International Dictionary (1954) defines mercantile: "Of, or pertaining to merchants, or the business of merchants; characteristic of, or befitting a merchant; having to do with, or engaged in trade."

The world-renowned Oxford Dictionary (in 13 elephantine volumes) defines mercantile as: "Of or belonging to merchants or their trade; concerned with the exchange of merchandise; of or pertaining to trade or commerce; commercial."

Funk & Wagnalls New College Standard Dictionary: "1. Pertaining to or characteristic of merchants. 2. Conducted or acting on business principles; commercial."

New Century Dictionary: "Of or pertaining to merchants or trade or commerce; commercial; engaged

in trade or commerce (as a mercantile house) ; in polit. econ., of or pertaining to the mercantile system."

Bouvier's Law Dictionary: "Mercantile Law. That branch of law which defines and enforces the rights, duties, and liabilities arising out of mercantile transactions and relations." Derived from Law Merchant defined as "The general body of commercial usages in matters relative to commerce. Blackstone calls it the *custom of merchants.*"

In 1933, this Court, speaking through Justice LINN, said: "Mercantile is defined as follows: By Century Dictionary: Of or pertaining to merchants, or the traffic carried on by merchants; having to do with trade or commerce; trading; commercial; characteristic of the business of merchants; by Standard Dictionary: Of, or pertaining to, or characteristic of merchants, or the business of buying and selling merchandise; conducted or acting on business principles; commercial."

With this absolute unanimity on the meaning of the word *mercantile,* how does the Majority today justify an interpretation which defies dictionaries, court decisions and the archives of memory which run not to the contrary? The Court in effect answers this question by saying that a new dictionary has been compiled: One edited and published by the City Council of Philadelphia. Conceding that the City Council has considerable powers under the City Charter, and acknowledging that this Court has vast constitutional powers, it does not seem to me that even the combined authority of Council and Court can confer upon Council a lexicographical jurisdiction which will authorize it to alter the English language. The Majority even says that the City has the right to "create its own dictionary." I doubt that statement, but even assuming it to be true, no dictionary can

make of a horse a cow, nor can any dictionary transform a lawyer into a grocer, butcher, manufacturer, or merchant. And it is not evident that City Council ever intended such a startling metamorphosis.

Section 3, Article III of the Pennsylvania Constitution declares that: "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title."

The obvious intention of this provision is to enable all citizens to be kept informed on legislation affecting their particular activities, pursuits, and welfare. The maxim that everyone is supposed to know the law is a statement of towering fantasy because it purports to say that everyone knows *all* the law, including all court decisions, statutes, ordinances and the limitless expanse of rules and regulations promulgated under such decisions, decrees, statutes and ordinances. Counting the leaves of the trees of the forests on the North American continent would be a simple task in comparison to reading and digesting what is contained in all the pages of all the multitudinous books of the law. It is because the founders of our Commonwealth were aware of the vertiginous celerity with which laws are enacted that they declared, through the organic law of the State, that each law, as it comes off the assembly lines of the legislative and executive machine, must carry a designation and a name so that those to be affected thereby will at once be warned of its applicability to them. And it was for that reason that the Constitution decreed that each law must carry but one subject, and but one title. In the case of *Lancaster City Annexation Case (No. 1)*, 374 Pa. 529, we said: "In order to enable persons, corporations, authorities, businesses and governmental subdivisions affected by any particular statute, to be kept

informed on what is currently expected of them, our constitutional fathers wisely provided that statutes having to do with shoemakers must mention shoemakers in the title. . . . Thus, shoemakers wanting to know about new laws appertaining to their trade, would pass over any statute which in its title referred to port regulations."

The title of the Ordinance of December 9, 1952, does not by the remotest suggestion mention lawyers. Nor does it say that the ordinance imposes a tax on certain businesses *and* professions. It says certain businesses, *including* professions. The lawyer watching for legislation applying to lawyers could never think, unless he were of a particularly suspicious nature, that mercantile business was intended to include the law profession. The words "mercantile" and "businesses" severely limit the word profession to those engaged in a profession having the aspect of mercantile activity.

In *Com. v. Kebort*, 212 Pa. 289, the legislation there involved was entitled: "An Act to provide against the adulteration of food . . ." The question in that case was whether the meaning of the word "food" was ample enough to include drink. If the logic employed by the Majority in the case at bar had been exercised in the *Kebort* case, the question there posed would have had to be answered in the affirmative because *food* can more logically embrace drink (especially milk, soup, bouillons, cocoa, chocolate) than mercantile business can include lawyers. But this Court said that food did *not* include drink: "The first question before us is whether that section can be sustained as to drink, under the constitutional requirement that the subject of the act shall be clearly expressed in the title. The right of the legislature to define the terms it uses is beyond question and the meaning it so at-

taches is mandatory upon the courts in the construction of the statute. But where such meaning is given to the words describing the subject of the act, and is not that which attaches to them in the common understanding, the constitution requires that the title shall express such special meaning with at least sufficient clearness to put readers on inquiry as to the full provisions."

"As to drink, this act plainly fails to meet this requirement. . . . The words food and drink in common usage and understanding are complementary and associate terms, denoting the two prime necessities of life, but they are so far from synonymous that they. import a plain and fundamental distinction, as universal as language and as old as the human race. No tongue is so primitive that it lacks different words to indicate them and different words to express the sensations of want of them, as hunger and thirst."

". . . No liquor dealer, as the appellants are, having a wakeful eye to the strict regulations of his business by the other statutes, would suppose he was to be affected by a new act with a title indicating food as its only subject. Nor is it reasonable to suppose that his representative in the legislature so intended. The act is clearly unconstitutional so far as it assumes to apply to drink."

It will be noted here that the Court said that where the legislation intends to give to a word a meaning other than that which attaches to it "in common understanding," the title shall express "such special meaning with at least sufficient clearness to put readers on inquiry as to the full provisions." Thus, in the Ordinance at bar, the word *profession* in the title could only be accepted as referring to the *legal* profession if it specifically said *legal* profession.

The Majority Opinion says that "it is a familiar canon of construction of statutes and ordinances, as indeed of contracts, wills, and other written instruments, that presumably every word, sentence or provision therein is intended for some purpose, and accordingly must be given effect." Accepting that statement as legal tender, what does the Majority do with the word "mercantile" in the title? If every word is intended to serve some purpose (as of course it is) why does the Majority ignore mercantile in its interpretation of the Ordinance? The Majority Opinion says: "It would seem plain, therefore, that the intention of the ordinance was to impose the tax, *notwithstanding its designation as a 'mercantile* license tax', on professions, occupations and vocations as well as on mercantile establishments . . ."

*Notwithstanding* is a dangerously destructive word to use in interpreting an Act or Ordinance. I do not know from what fount of authority this Court derives the power to say that *notwithstanding* what a legislative body has said, it really means something else. A few *notwithstandings* in court decisions could wreck a whole civil or criminal code.

The Pennsylvania Constitution, as already indicated, states that only one subject can be carried in the title of an Act. The Philadelphia Home Rule Charter (approved April 17, 1951) is even more restrictive. It provides in Section 2-201 that: ". . . Every ordinance . . . shall contain not more than one subject which shall be clearly *and adequately* expressed in its title." Adequately means, of course, what it says. City Council may not change the meaning of *that* word, even if it desired to do so. Adequacy is particularly a sine qua non in proclaiming the purpose of a bill when the bill makes a fundamental change in the personality or substance of a given type of legislation. His-

torically, a mercantile tax has always been a tax on the sale of goods, wares and merchandise. (*Beaver County Cooperative Association's Appeal,* 118 Pa. Superior Ct. 305.) In *Com. v. Harrisburg L. & P. Co.,* 284 Pa. 175, we defined a mercantile tax as "a license tax for vending merchandise." This definition has definitely become history in our decisions. *Duquesne Club v. Pittsburgh,* 170 Pa. Superior Ct. 426; *Commonwealth v. McKinley-Gregg Automobile Co.,* 345 Pa. 544.

Although the stream of history is an erratic one, we know that so far as the law is concerned, it may not, like the Mississippi River, suddenly change its course and inundate unsuspecting property and civil rights without some previous warning or notification to the affected owners. If lawyers in Philadelphia are to be classified by a City ordinance as vendors of merchandise, the ordinance which makes them so, must advise them clearly and adequately. And they are certainly not adequately notified when they are indiscriminately thrown into an amorphous classification of *businesses.*

In its brief before this Court, the City appellant emphasizes the word *business* when quoting the Ordinance. Thus, quoting from the Title, from Section 2 and Section 3, it italicizes the word *business* wherever it appears. But while it bears down hard on this word in the Ordinance, it cautiously tiptoes by the word *mercantile.* But *mercantile* is the piece de resistance of this entire legislation. To ignore *mercantile* in the Ordinance is to forget the Dane in Hamlet.

It is not enough to hint at the subject matter in the title of a piece of legislation. A mere whisper of intimation falls far short of the Constitutional and Charter requirement of clarity and adequacy in the title. To permit the Ordinance of December, 1952, to

apply to lawyers is to affirm a procedure which defies the American principle of open statutes openly arrived at. It would suggest that the City Council legislated by stealth, saying one thing, but meaning much more than it said. It would ascribe to the City Fathers a "cleverness" and lack of frankness which is not warranted by the record. It would suggest that the legislature of the City legislated not openly but by ambush.

The rationalization of the City executive department in seeking to bring the legal profession within the compass of the title of the Ordinance, which admittedly does not mention the legal profession, is a forced one. It says, in effect: "The word 'business' is in the title; business is said to include profession; the practise of the law is certainly a profession. Therefore, the practise of the law is a business, and all practitioners of law must obtain a mercantile license." This argument is calculated to lead one persuasively along a track of reasoning until, before one can be made aware, he is led into forbidden territory. In 1872 our State Legislature passed an Act, the title of which authorized the Union Passenger Railway "to lay additional tracks of railway." Under the color of this title, the railway company proceeded to lay tracks in territory into which it had no right to go, but this Court halted the transgression: "To lay additional tracks on an existing railway is a different thing from extending the railway itself into new territory not before authorized to be used. The difference in purpose is so palpable, and the difference in consequences so grave, the mind cannot hesitate a moment in the conclusion that the language which authorizes the former only cannot mean to sanction the latter. To confound these two is to open the door to fraud, and to enable men, expert in the use of phrases, to steal away the rights of the people; and this it was a purpose of the

amendment to prevent. Then, clearly, a reader of this title alone would be led to conclude that the purpose of the supplement was to enable a single-track railway company, as this company was, merely to lay down additional tracks along its line of railway. The language is not that of extension of its line into new places, but of addition to that which it had already." *Union Passenger Railway Company's Appeal,* 81* Pa. 91, 94.

The same principle was involved in the case of *Guppy v. Moltrup,* 281 Pa. 343, which had to do with the Uniform Sales Act of 1915, entitled "An Act relating to the sale of goods." This Court, holding that the sale of corporate stock did not come within the title of the Act, declared that "the numerous stock brokers and others buying and selling capital stock in this Commonwealth," would not expect "to find in 'An Act relating to the sale of goods', a provision regulating the sale of such (capital) stock."

Quoting from the *Union Passenger Ry. Co.* case, supra, this Court reaffirmed in the *Guppy* case the proposition which could be the short reply to the City's apparent position that it is enough if the title of an Act or Ordinance hints sufficiently to provoke the reader into a detailed study of the legislation: "Confiding in the title as applicable to a purpose unobjectionable to the reader, he is led away from an examination of the body of the bill. In such a case the subject is not *clearly expressed* in the title. Indeed, it is not expressed at all. It may have something colorable in it, but this is merely hinting at the subject, not expressing it . . . Nothing ambiguous can be said to be clear, and this is a decisive answer to the argument that the title is sufficient to lead to inquiry. An inquiry into a dubious or uncertain thing is not the purpose [of the constitutional provision.] Its require-

ment is that the subject should be clearly expressed."

In 1889, Chief Justice PAXSON of this Court declared that "the profession of the law is one of the highest and noblest in the world." * What has caused the egregious confusion which now, for the first time in the history of the courts, transforms that high and noble profession into a mercantile business? There is not a member of the bar or a judge on the bench that has not heard from student days distinguished jurists, celebrated statesmen and great legal authors declare that one should never enter into the profession of the law primarily to make money. (But I do not recall ever hearing any one say that *that* was not the primary purpose for entering into business.)

The lower court properly interpreted the Ordinance when it said that the phrase "certain . . . professions" in the Ordinance means those aspects of professional activity that are *mercantile* in nature, "and, in support of that very sound observation, it called forth a distinguished Opinion written by the present Chief Justice in 1935 when he was President Judge of Court of Common Pleas in Philadelphia County, his decision receiving the unanimous affirmance of this Court. (*Biser's Appeal,* 317 Pa. 190.) In that case a pharmacist who sold bottled drugs which he had himself compounded argued that the Emergency Sales Act of 1932 levied upon "sales of tangible personal property" did not apply to his product because the practise of pharmacy was a "profession" rather than a "business." The President Judge rejected this argument: "Those words are popular rather than 'legal' terms. A minister's sermon, or a brief prepared by a lawyer, or a physical examination of a patient by a physician, is not the subject of a sale, but a bottle of

---

* *Petition of Joseph P. Splane,* 123 Pa. 527.

medicine is. It may well be that pharmacy is a 'profession,' but that is no reason why the legislature should not tax the sale of medicines compounded by a pharmacist, and the act makes no distinction in favor of pharmaceutical products, nor excepts them from the general class of 'tangible personal property.' "

Using the words of President Judge STERN (now Chief Justice STERN), what is it that a lawyer sells which makes him a mercantile business man? It is admitted that it is not his brief.

Section 3 of the Ordinance, which carries the heading of "Imposition and Rate of Tax," contains nine different classifications of tax. Eight of these classifications employ language specifically applicable to the business of selling and vending—either wholesale or retail. What does a lawyer sell—either wholesale or retail? The ninth classification reads: "(e) All other persons engaged in business at the rate of three (3) mills on each dollar of the annual gross volume of business transacted."

It is obvious from what precedes this paragraph (e) that it (paragraph "e") applies to those persons whose businesses strictly are not the selling of merchandise but yet are so indissolubly associated with the business of selling that they must be included in the ambit of mercantile activity, as, to give an illustration, the business of auctioneering which represents both vendor and vendee.

The strictly mercantile aspect of the Ordinance, and thus its non-applicability to lawyers, could not be made more apparent that it is in Section 2 which specifies: "Section 2. Licenses. Beginning in the year 1953, and annually thereafter, every person desiring to engage in or continue to engage in any business shall, on or before the first day of January in each license year, or prior to the first day of business in any such

license year, procure a mercantile license for *each of his places of business in the City,* from the Department of Licenses and Inspections which shall issue the same upon payment of a fee of three (3) dollars for each place of business in the City."

How many places of business does a lawyer have? A few lawyers (very few in comparison to the number practising) may have a city office and an office in a suburban town, but it is so rare as practically to be non-existent for a lawyer to have two offices in the city. (And this Ordinance only applies to the City—*one* City.) At any rate, no legislator, lawyer or drafter of ordinances for the City of Philadelphia, would, with any degree of concern for the accuracy of language, refer to a lawyer's office as a mercantile place of business!

In an apparently determined search on the part of the Majority to find what it is that a lawyer vends, so that his "business" may be regarded mercantile, the Majority says that the lawyer "sells his services for a financial consideration, just as a business man sells his merchandise." In attempted substantiation of that statement the Majority makes reference to an apocryphal motto attributed to Abraham Lincoln that "A lawyer's time is his stock in trade."

It is questionable whether Lincoln ever made this remark,* but it cannot be questioned that Lincoln of-

---

* A study of Lincoln's accredited writings fails to produce this aphorism. There are many maxims and mottos attributed to Lincoln which fall into classifications of spurious, hearsay and obscure. The one quoted by the Majority is classified as an axiom supposed to be Lincoln's because it *sounds* like Lincoln's "diction." Its source has not been ascertained. The Lincoln National Life Foundation, which makes an effort to trace the origin of supposed Lincoln sayings, reports that this one (reported as reading: "A lawyer's time and advice are his stock in trade") apparently came to life in a plaque produced by the Allen Smith

ten gave of his time gratuitously to indigent clients in whom he saw injustice crying out for redress. There is not a reputable lawyer at the bar that has not in his career devoted hours and days of his time at his books, in trial courts and in appellate courts in championing a cause which could bring him no financial return but which would compensate him richly with the satisfaction of having upheld the highest ideals of the legal profession which are in no way based upon secular and materialistic returns.

That lawyers must be paid, and sometimes paid very well for their services, is only natural and proper, but to say that because they receive money for their services this makes them merchants, is like comparing, in the words of Abraham Lincoln, "a horse chestnut with a chestnut horse."

To say that because lawyers are paid for their services they place those services on the scales in the market place under the heading of vendible merchandise is not only an unwarranted reflection on the ideals of the Bar, but it happens to be bad law as well. That grand man of the law, Justice OLIVER WENDELL HOLMES** said that: "One of the good things about the law is that it does not pursue money directly. When you sell goods the price which you get and your own interests are what you think about in the affair. When you try a case you think about the ways to win it and the interests of your client."

Another reason why I am convinced that City Council never intended to include lawyers in the Ordinance is that Council would not advocate deception.

---

Company in Indianapolis, perhaps a mercantile firm engaged in producing these mottos for lawyers' offices. (Bulletin, Lincoln National Life Foundation No. 1057, July 11, 1949.)

** Collected Legal Papers, Holmes; Harcourt, Brace & Howe, P. 153.

Section 2, as indicated, provides that all persons subject to the mercantile tax must conspicuously post their mercantile license. For a lawyer to display such a license would be to declare falsely to the world that he was engaging in a mercantile activity. The fact that the posting feature of the Ordinance has reportedly now been repealed does not alter the significance of its inclusion in the first place because it reveals that Council, at the time of passage of the measure, was thinking in terms of stores, warehouses, market stalls, factories, mills—and not lawyer's offices. At the oral argument before this Court, counsel for the City presented a photostatic copy of an Ordinance (Bill 35) which states that Section 2 of the Ordinance of December 9, 1952, has been amended by "removing the requirement for the posting of licenses." But Section 9 of the Ordinance remains intact, and it still carries a penalty for failing to post the notice! Assuming, however, that the repeal of the posting feature has been duly effectuated, the taxpayer is still required to obtain the license and he must have it on hand to display to every city official and inspector who demands to examine it. It may be in the long run, if inspection runs riot, that the lawyer may find it more practical to have the license conspicuously framed and conspicuously hung in his office, thus avoiding the necessity of having to remove it from his files for examination each time the whimsy of an inspector or city official dictates inspection of it. The displaying of the license may also serve to smother unjust suspicion that the lawyer has not paid the mercantile tax.

The City, arguing that the obtaining of the mercantile license is merely a matter of registration, states in its brief: "This $3 charge, however, is a mere registration fee, designed to inform the City of the identity of those liable for the payment of the tax."

This argument is not very convincing to me. The identity of the lawyers in Philadelphia can be ascertained with the maximum of ease by a simple glance at the Lawyer's Directory. If only identification is sought, why is it necessary to collect $3 from each lawyer?

Nor does the City, in my judgment, advance the logic of its argument when it says that the registration of lawyers under the Ordinance can be compared, from a legal point of view, to the registration of gamblers as upheld in *United States v. Kahriger*, 345 U. S. 22. The City uses the language of the Supreme Court in that case by italicizing the sentence: "The *registration provision makes the tax simpler to collect.*" But the matter of collection from lawyers cannot be made any simpler than it is since they are already duly tabulated, with addresses and telephone numbers, in the telephone book and in the legal directory.

A study of the relevant decisions, a re-evaluation of history portraying the ever-increasing encroachment of bureaucracy on the rights and freedoms of the individual, a sense of distress over a creeping diminution in respect for the great professions which have taken civilization to the pinnacle of intellectual and cultural achievements, a realization that the Ordinance of December 9, 1952, is another blow at the glorious independence which once characterized the Bar of this great city, all lead me to the inevitable conclusion that the Ordinance as upheld by the Majority of this Court will accomplish far more harm than the possible benefits it will collect from license fees.

The decision of the Majority is a paradox. It cannot be gainsaid that the primary objective of any business concern is financial gain. By making the legal profession a "business," its primary objective must also be presumed to be financial. The history of the legal

profession is quite to the contrary. In fact, every lawyer or judge who becomes a preceptor to a law student applying to take bar examinations is required to answer the following questions: "In practising law, do you believe his (the preceptee's) conduct would be regulated by a desire to do what he believes to be right rather than, primarily, for financial gain? Notably, does he give evidence of disinterestedness or does he seem to be fond of money?"

If the preceptors of all the lawyers now practising at the Philadelphia Bar, had answered these questions in conformity with the Majority's decision making the legal profession a "business", a cloud of doubt would settle over every lawyer's office as to whether the occupant is a champion of justice or a business man "fond of money." Against such an oppressive and melancholy situation I must declare a vigorous objection and I accordingly

Dissent.