509 A.2d 896

Tohickon Valley Transfer, Inc., Thomas L. Treadway, Shirley A. Lojeski *v.* Tinicum Township Zoning Hearing Board. Tohickon Valley Transfer, Inc., Thomas L. Treadway and Shirley Lojeski, Appellants.

Argued April 9, 1986, before President Judge CRUMLISH, JR., Judges ROGERS, CRAIG, MACPHAIL, DOYLE, BARRY and COLINS.

*John R. Crayton, McCarthy and Crayton,* for appellants.

*James M. Neill,* with him, *George M. Bush, Hartzel and Bush,* for appellee.

OPINION BY JUDGE CRAIG, May 15, 1986:

This zoning case presents an interrelated series of issues concerning a proposal to construct a trash transfer station on a site within the Planned Industrial District of Tinicum Township.

If an earlier zoning hearing board decision approving a permit in 1973 did not confer a vested right upon the present applicant, then this court must decide whether a trash transfer station now qualifies as a permitted use under the zoning ordinance provisions allowing junkyards and truck terminals in the industrial district.

If the use is not permitted in this township, then we must consider whether such an exclusion of trash transfer stations is justified by the county's solid waste management plan or any other consideration.

Finally, an overriding question is whether the township's floodplain regulations bar the existence of such a facility from the particular site here involved.

This appeal comes from an order of the Bucks County Court of Common Pleas which affirmed a 1983 decision of the township's zoning hearing board rejecting the application of Tri-State Transfer Co., Inc., present owner of the site, for approval of the trash transfer station. Tri-State relied, alternatively, upon claims of compliance with the ordinance and claims as to its invalidity.

The 17-acre site is located between Route 611 and Tohickon Creek. Transfer Removal and Specialty Hauling, Inc. (T.R.A.S.H.) had appealed to the zoning hearing board in 1973 from a denial of a permit for a trash transfer station and had then obtained from the board a conditional approval and the issuance of a one-year permit, which, after renewals, expired finally in 1981. In 1982, intervenor Tohickon Valley Transfer, Inc., which had acquired the site from T.R.A.S.H., sold it to Tri-State for $400,000 and took back a purchase money mortgage. Tri-State, pursuing essentially the same site plan as that which T.R.A.S.H. had presented in 1973, applied for approval in 1983 and appealed to the zoning hearing board when the zoning administrator refused a permit. Between 1973 and 1983, neither T.R.A.S.H. nor its successors have taken any steps toward constructing the facility, which is to include a building.

The trial court took no additional evidence beyond that which the zoning hearing board had received. As the trial judge correctly noted, the proper scope of judicial review is therefore confined to determining whether the zoning hearing board abused its discretion or committed an error of law. *Rothrock v. Zoning Hearing Board of Whitehall Township,* 13 Pa. Commonwealth Ct. 440, 319 A.2d 432 (1972).

The intervenor mortgagee, Tohickon, is now the active party pursuing the appeal; the appellee township has not challenged its standing to do so.

*Effect of the 1973 Zoning Approval and Permit*

The initial question is whether the present owner and mortgagee can rest their case for proceeding with the trash transfer station upon the 1973 decision of the zoning hearing board and the successive permit renewals pursuant to it. The 1973 board decision found the use to be "reasonably consistent" with the permit-

ted uses as then stated. However, during the intervening decade, Tinicum Township modified its zoning ordinance—including the industrial district provisions—and also adopted floodplain regulations pursuant to the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202, and the Flood Plain Management Act, Act of October 4, 1978, P.L. 851, §§101-601, 32 P.S. §§679.101-679.601.

Whether the vested rights claim of the present owner be regarded as an entitlement legally surviving the revocation of a valid permit, *Klein Appeal*, 395 Pa. 157, 149 A.2d 114 (1959), or as a claim based upon an invalidly issued permit, *Petrosky v. Zoning Hearing Board of Upper Chichester Township*, 485 Pa. 501, 402 A.2d 1385 (1979), the determinative question is whether the applicant ever expended substantial funds in reliance upon the permit.

The record readily answers that question. Because the earlier approved permit, as renewed, expired finally in 1981, before either the present owner or mortgagee acquired any interest, the facts show no expenditure made on the basis of that permit, whether it be regarded as validly or invalidly issued. Tri-State acquired no title until 1982, and Tohickon, which sold to Tri-State, identifies its commitment as consisting only of the sale to Tri-State, financed through a 100% purchase money mortgage. The trial judge correctly decided that Tohickon cannot thereby claim to have made any expenditure toward establishing a use in reliance upon a permit. Acceptance of a purchase money mortgage is not remotely equivalent to such an expenditure because, by its very nature, the mortgage insures that Tohickon will recover either its purchase price or the real estate itself.

*Permitted Use Provisions in the Planned Industrial District*

Do the permitted use provisions of the zoning ordinance allow a trash transfer station within the industrial district under the ordinance's definition of "junkyard" or as a truck terminal? The earlier interpretation by the township's zoning hearing board, in 1973, which found the trash transfer station to be "reasonably consistent" with the permitted uses as then stated, is not now binding because the township revised the industrial district provisions in 1982.

The present use provisions for the Planned Industrial District do not expressly label a trash transfer station as permitted, but section 600.2(a)(23) of the ordinance expressly allows a "Junk Yard" and section 704(G10) defines "Junk Yard" in the following generic terms:

*An area of land, with or without buildings, used for the storage of* used or *discarded materials,* including *but not limited to,* waste paper, rags, metal, building materials, house furnishings, machinery, vehicle or parts thereof (with or without dismantling), *processing, salvage, sale or other use or disposition of the same.* (Emphasis added.)

The trash transfer station proposal fits within that definition. It would consist of an area of land with a building, "used for the storage of ... discarded materials," and for the "processing ... or disposition of the same."

In common parlance, a junkyard and a trash transfer station differ in that a junkyard normally involves the sale of salvaged materials, while such transactions do not occur at refuse transfer points. Indeed, the quoted definition, after initially characterizing the use as involving the "storage of ... discarded materials,"

proceeds expressly to mention "salvage" and "sale," although it does so disjunctively in relation to "other ... disposition."

However, municipal ordinances are not limited to ordinary connotations but may embody their own dictionary by the use of definitions like the ones stated above. Although the courts will give *undefined* terms in a zoning ordinance their common or everyday meaning, *Kuhn v. Hanover General Hospital,* 34 Pa. Commonwealth Ct. 207, 382 A.2d 1305 (1978), enactment of a specific definition in the ordinance produces a different effect because

> the legislative body may furnish its own definitions of words or phrases in order to guide and direct judicial determinations of the intendments of legislation, and such definitions may be different from ordinary usage. Sterling v. Philadelphia, 378 Pa. 538, 106 A.2d 793 (1954)....

*Klein v. Township of Lower Macungie,* 39 Pa. Commonwealth Ct. 81, 86, 395 A.2d 609, 611 (1978).

The trial judge concluded that a trash transfer station did not fall within this definition, noting that the ordinance listed "those materials which a junkyard may contain" and omitted any mention of garbage, *i.e.,* discarded food. However, although the definition does expressly refer to dry or inorganic refuse materials— "waste paper, rags, metal, building materials, house furnishings, machinery, vehicles or parts thereof"—the ordinance also plainly states that its allowance of the storage of discarded materials is *not limited to* those materials. Recognizing that the list thus is not all-inclusive, the trial judge nevertheless decided that "trash" cannot be considered one of the materials that the governing body intended to allow; he ruled organic material out of the definition by considering that:

> The discarded food and its liquid could seep into the ground, attract insects, rats and vermin, and create various other nuisances which the dry materials listed would not create.... The storage or processing of discarded food create health hazards which the storage or processing of the materials listed in the ordinance would not create.

However, there is no ambiguity in the definition which requires speculation about legislative intent. The literal terms, relating to the storage and disposition of discarded materials, embrace refuse of all kinds because discarded materials and refuse are synonymous. Thus, the present proposal comes within a permitted use category of the ordinance.

*The Alternative Exclusionary Effect of the Ordinance*

As the trial judge noted, the parties recognize without dispute that a trash transfer station is a legitimate use and, if the Planned Industrial District provisions were to be construed not to allow it, then the ordinance would have the exclusionary effect of prohibiting it entirely from the municipality. Citing *Beaver Gas Co. v. Osborne Borough,* 445 Pa. 571, 285 A.2d 501 (1971) and *Exton Quarries, Inc. v. Zoning Board of Adjustment,* 425 Pa. 43, 228 A.2d 169 (1967), the trial judge correctly stated that:

> A zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare than an ordinance which merely confines that business to a certain area in the municipality.

However, the trial judge found that the municipality here met the burden of justifying the exclusion which the township's restrictive interpretation of the permitted use provisions would produce.

Initially, the trial court, like the zoning hearing board, held that the Bucks County Solid Waste Management Plan would justify the exclusion because that plan proposes that trash transfer stations be located in Doylestown and Perkasie-Sellarsville rather than in Tinicum Township.

The county plan, however, cannot supply legal justification for an interpretation totally prohibiting trash transfer stations, whether the contention be (1) that the plan somehow indicates police power concerns bearing upon Tinicum Township, or (2) that the plan relieves this township of any responsibility for allowing such uses.

First, the mere presence or absence of the plan cannot conceivably have any effect upon whether a trash transfer station would unreasonably threaten the health, welfare or safety of this particular community. Although, as the trial judge read it, the plan "indicates that a trash transfer station is not necessary in Tinicum Township because it generates little solid waste and has a low population," a municipality cannot meet its exclusionary burden by merely establishing that the particular trash transfer station location is unnecessary for Tinicum Township. Deeply rooted in our exclusionary zoning concepts is the principle that individual municipalities shall not function as island communities, concerned only with their own needs.

Secondly, Tinicum Township cannot rest its burden upon the county plan as shifting elsewhere the responsibility for providing such a use. In *Fox Chapel Borough Appeal*, 33 Pa. Commonwealth Ct. 256, 261, 381 A.2d 504, 507-8 (1978), this court rejected the contention that "membership in a regional planning effort cures the otherwise exclusionary and unconstitutional nature" of an ordinance, reiterating an earlier holding, from *Nicholas, Heim & Kissinger v. Harris Township,*

31 Pa. Commonwealth Ct. 357, 362, 375 A.2d 1383, 1385 (1977), that "regional comprehensive planning provides no justification for a municipality's exclusionary zoning practices."

In those two opinions, this court noted that regional plans, in themselves, do not have the legal effect of an ordinance. Judge ROGERS, in *Nicholas, Heim* & *Kissinger*, envisioned future legislation empowering municipalities to enter into a binding regional zoning arrangement, and later the General Assembly did in fact amend the MPC to provide authority for binding regional zoning in MPC §§1101-A-1108-A, 53 P.S. §§11101-A-11108-A, and also amended MPC §1011(1)(b), 53 P.S. §11011(1)(b), expressly to allow judicial recognition of the legal effect of implementing regional plans by regional zoning. However, there is no regional zoning on which Tinicum can rely to demonstrate that provision for refuse transfer has been made elsewhere.

A further justification for a total exclusion of the trash transfer station from Tinicum, if its ordinance effects such a prohibition, was the conclusion that the proposal would violate the floodplain restraints of the ordinance. That issue warrants separate treatment because, even if the ordinance does not exclude this proposed use from the industrial district and hence the entire township, the fact that the site is within the floodplain means that the floodplain zoning can operate as an independent restriction. Section 804.05B(2) of the ordinance provides that the floodplain limitations, if more restrictive, shall prevail over the provisions of any underlying zoning district.

*Compliance with Floodplain Zoning Restrictions*

Because the site is located within a floodplain, as defined below, the township's floodplain zoning restrictions place the portion near the creek within a Flood-

way District in which structural development is prohibited, and place the trash transfer facility's location within a Flood-Fringe District in which the ordinance allows structural development subject only to flood-proofing requirements.

Precisely because the proposed trash transfer station is to be located in the Flood-Fringe District and not in the Floodway District where construction is barred, it does not violate the floodplain zoning restrictions.

By misinterpreting the floodplain zoning provisions and map, the zoning hearing board made a crucial error of law, reflected in its Finding No. 26 and on p. 9 of its decision, concluding that the trash transfer station and its proposed structure was within the flood*way* district. The board's action in so finding was arbitrary because there is no legal basis, either in the township's zoning ordinance or on the floodplain map or otherwise, for that conclusion. In the trial court decision, Judge BIESTER excellently analyzed the floodplain zoning provisions and pinpointed how the board erred in placing the proposed station within the construction-free Floodway District. Judge BIESTER's opinion explains:

"The purpose of the floodplain provisions of the zoning ordinance is to control uses of land which would result in the restriction of the flow of water during a major flood and consequently, cause extensive damage to the properties surrounding the river or stream. The designation of these areas of land as susceptible to extensive damage during a major flood were made by the Department of Housing and Urban Development (HUD) in August, 1982, in order to aid in the administration of the Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973. HUD made various calculations in order to measure the boundary of

the area of land surrounding a stream or river which would be affected by a major flood. HUD defined a major flood, *inter alia,* as a flood which will occur every 100 years, or has the probability of occurring 1% of the time. This major flood is called a 100 year flood. The area of land encompassed by the 100 year floodline is called the floodplain which is divided into two flood districts, the flood*way,* the land adjacent to the stream, and the flood*fringe,* the area between the floodway and the 100 year floodline.

"The floodplain provisions of the zoning ordinance define a flood*plain* as:

'Section 804.

(d) Floodplain—(1) a relatively flat or low land area adjoining a river, stream or watercourse which is subject to partial or complete inundation; (2) an area subject to the unusual and rapid accumulation of runoff of surface waters from any source.'

"Although the definition does not indicate that the outer boundary is the 100 year floodline, Section 804.05 does provide that:

'Section 804.05.

A. For the purposes of this Ordinance the various floodplain districts shall include those areas identified as being subject to the one hundred (100) year flood, in the Flood Insurance Study prepared for Tinicum Township by the Flood Insurance Administration.'

"The ordinance further provides that the floodline for the flood*way* district is:

'Section 804.05.

(1) The Floodway District (FW) is delineated for purposes of this Ordinance using the criteria that a certain area within the floodplain must be capable of carrying the waters of the one hun-

dred (100) year flood without increasing the water surface elevation of that flood more than one (1) foot at any point. The Floodway District is shown on the Tinicum Township Official Zoning Map. The areas included in this District are specifically defined in the Floodway Data Table of the above referenced Flood Insurance Study and shown on the accompanying Flood Boundary and Floodway map.'

"The floodfringe is the rest of the 100 year floodplain, or:

'(2) The Flood-Fringe District (FF) shall be that area of the 100-year floodplain not included in the Floodway District. The basis for the outermost boundary of this District shall be the one hundred (100) year flood elevations contained in the flood profiles on the above referenced Flood Insurance Study (FIS) and as shown on the accompanying Flood Boundary and Floodway Map.

Section 804.05(A2).'

"The Zoning Hearing Board erroneously concluded that the boundary for the flood*way* is the 100 year floodline. The ordinance clearly defines the boundary for the flood*plain* as the 100 year floodline. It does not provide that the boundary for the flood*way* is the 100 year floodline. Section 804.05 A....

"The distinction between floodway and floodfringe is relevant for various uses of land permitted in each. Since the floodway is adjacent to the stream or river, the land can only be used for agricultural purposes, public and private recreation, accessory residential uses, and accessory industrial and commercial uses. Section 804.10(A). The land in the floodfringe district, on the other hand, can be used as provided in the underlying zoning ordinance so long as the structures are

adequately floodproofed. Section 804.11 (A)." (Emphasis in the original.)

Thus the trial judge wrote, and we cannot improve upon that lucid analysis.

Because the Floodway District is an overlay zoning district with its boundaries laid out upon the floodplain zone map (Exhibit A-18), officially made part of the ordinance by section 804.05A(1), and also with its boundary shown upon the site plans (Exhibits A-3, A-10), the error of the board's application of the ordinance is apparent. As Judge BIESTER well pointed out, the board's mistake lay in equating the limited floodway with the *entire* floodplain (including the Flood-Fringe District) which has the 100-year floodline as its outer boundary. Exhaustive scrutiny of the testimony indicates that the board's legal interpretation of the ordinance in this respect may have been led astray by the testimony of the township engineer who, contrary to the zone map and site proposal, expressly stated that he was *assuming* that the development was proposed to be within the *floodway* (231a-232a).[1]

Finally, even with the board's erroneous extension of the Floodway District cleared up, the trial court erred by ruling that the proposed development was never-

---

[1] The errors of the township engineer's interpretations of the township's floodplain provisions are well illustrated by the inconsistencies in his attempts to apply the flood districting ordinances and map terms to the proposal. First, as he read the ordinance, the 100-year floodline and the flood*way* were "one and the same" (157a, 175a, 186a), so that virtually the entire tract and the proposed structures were in the flood*way* (158a)—all contrary to the trial judge's sound reading. Subsequently, he testified that the proposed structures were *not* within the flood*way* as shown on the flood study incorporated by the ordinance. (183a, 184a). Later he described the proposed improvements merely as being within the flood*plain*. (226a). Thereafter, he returned to "assuming" that the development would be in the flood*way*. (231a, 232a).

theless prohibited in the Flood-Fringe District, where the ordinance expressly allows floodproof construction.

As correctly quoted above by the trial judge, Ordinance §804.05A(1) defines the Floodway District as the area within the floodplain capable of carrying 100-year floodwaters "without increasing the water surface elevation of that flood more than one (1) foot at any point." Astutely, the trial judge explained that definition as confirming that the flood*way* is the area which is *capable of carrying* "that portion of the overflow of 100 year flood which rises above one. foot." The Flood Insurance Study, which section 804.05A of the ordinance incorporates by reference, establishes quite clearly why that capacity within the Flood*way* District permits development to occur in the Flood-*Fringe* District beyond. The Study states:

> The area between the floodway and the boundary of the 100-year flood is termed the floodway fringe. The floodway fringe thus encompasses the portion of the floodplain that could be *completely obstructed* without increasing the water-surface elevation of the 100-year flood more than one foot at any point.
>
> (R 284a, emphasis added).

Thus the logical relationship underlying the Floodway and Flood-Fringe Districts is apparent. Floodplain zoning prohibits all structures within the Floodway District in order to leave it unobstructed so that it may carry *all* of the 100-year floodwaters beyond the tolerable limit of not more than a one-foot increase in the elevation of those floodwaters. Correspondingly, the ordinance allows construction in the Flood-Fringe District because it is an area where construction would not cause floodwaters to exceed that one-foot rise even if development. *completely obstructed* the area of the floodway fringe.

The trial court, and also the board, erroneously subjected the Flood-Fringe District on this site to the Floodway District's construction prohibitions by relying upon the general language of section 804.09 of the Ordinance, which reads:

> Under no circumstances shall any use, activity and/or development adversely affect the capacity of the channels or floodways of any watercourse, drainage ditch, or any other drainage facility or system.

Correctly noting that this provision is in a section relating to the floodplain in general, the trial judge referred to testimony of the township engineer that the proposed station and its driveway would create a damming effect when the creek is in flood—testimony, as noted above, expressly based upon an *assumption* that development would be within the *floodway*—and the trial judge therefore stated:

> As is shown in the instant case, if the proposed use lies in the floodfringe it too can adversely affect the carrying capacity of the floodway by blocking off water which would naturally flow into the floodfringe. Therefore, the relevant inquiry is not with which part of the floodplain the proposed site lies, but whether it adversely affects the carrying capacity of the floodway.

Both the board and the court misapplied section 804.09. As a matter of law, that section provides no legal warrant for a municipality, ad hoc, to extend the development prohibition of the Floodway District to locations within the Flood-Fringe District in which the ordinance expressly allows construction because, according to the study made part of the township's own ordinance, the latter is a district in which complete obstruction by development would not pose an unacceptable threat.

There is no basis for interpreting the general wording in section 804.09 as impliedly modifying section

804.11A which explicitly states that "development ... shall be permitted" in the Flood-Fringe District subject to flood-proofing. Section 804.09, although applicable throughout the entire floodplain, refers specifically to effects upon the capacity of *channels, watercourse floodways, ditches,* and drainage facilities; hence its purpose clearly is to provide a supplementary prohibition against development which would block any channels, watercourses or ditches, wherever located in the floodplain, including secondary streams in the Flood-Fringe District. However, the record here contains no evidence of any such factor.

Moreover, section 804.09 specifically deals only with construction affecting channel or watercourse capacity —the water volume-carrying measurement which would be affected by direct blockage within such a channel. There is no basis for extending this section to foster a hypothesis that construction in the Flood-Fringe District, not blocking any channel there, would divert water volume so as to overtax the adjacent floodway; as noted above, the ordinance and its study established the floodplain districts upon the principle that even complete obstruction of the Flood-Fringe District would not overtax the floodway

Zoning district boundaries, including those in floodplain zoning which must look to MPC §605(2)(vii), 53 P.S. §10605(2)(vii) for its authorization, must appear upon the zoning map with definiteness in order that landowners can rely upon predictable content within the zoning ordinance and map for the purpose of deciding where they can develop structures and where they cannot do so. Here the floodplain zoning district boundaries do appear as definite lines on the Tinicum maps. Such zoning district boundaries, including floodplain zoning districts, are not to be administered as if they were elastic and movable, lest they be used as tools for non-uniform enforcement. In adopting the zoning hear-

ing board's interpretation of section 804.09, the trial judge well summarized the situation by stating:

> The Board did not prohibit all structures on the site, but simply the structure Tri-State proposes.

However, the trial judge went on to speculate:

> Clearly, structures built differently and with different configuration which do not adversely affect the flow of Tohickon Creek would be permitted.

There is no basis in the record for that assumption; nowhere is there any indication that any trash transfer station proposal could be made acceptable to the township by any change in physical configuration.

Accordingly, analysis of this complex situation establishes that the trash transfer station proposal complies with the use and floodplain restrictions of the zoning ordinance because it falls within an express permitted use category in this industrial district, and its physical structures are proposed to be within a floodplain district, the Flood-Fringe District, as to which section 804.11A of the Ordinance states that:

> The development and/or use of land shall be permitted in accordance with the regulations of the underlying zoning district provided that all such uses, activities and/or development shall be undertaken in strict compliance with the floodproofing and related provisions contained in all other applicable codes and ordinances.

Therefore, the order of the trial court is reversed.

## ORDER

Now, May 15, 1986, the order of the Court of Common Pleas of Bucks County, dated February 5, 1985, at Docket No. 83-6869-14-5, is reversed.

Judge COLINS concurs in the result only.