STATE of Alaska, Appellant,

v.

James Edward ERICKSON, Jeffrey Mueller, David Andrew Laschober, Albert Vasconcellos, Anthony C. Phillips, Fred J. McVicker and Douglas Sopko, Appellees.

No. 3250.

Supreme Court of Alaska.

Jan. 20, 1978.

Charles M. Merriner, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellant.

Barbara Miracle, Sue Ellen Tatter, Asst. Public Defenders, Brian Shortell, Public Defender, Anchorage, for appellees David Laschober and Anthony C. Phillips.

Phillip P. Weidner, Drathman & Weidner, Anchorage, for appellees Albert Vasconcellos and Douglas Sopko.

Bruce A. Bookman, Anchorage, for appellee James Edward Erickson.

Douglas Pope, Anchorage, for appellee Fred J. McVicker.

R. Collin Middleton and Craig Cornish, Wagstaff & Middleton, Anchorage, for appellee Jeffrey Mueller.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Chief Justice.

The validity of Alaska laws prohibiting possession and sale of cocaine are ques-

tioned in these appeals, and we are presented with difficult questions involving the equal protection and due process clauses of the United States[1] and Alaska[2] Constitutions and the right to privacy.[3] Specifically, we must look to the entire statutory scheme for regulation of drug use and determine the following issues:[4]

1. Is the classification of cocaine users with users of narcotics over-inclusive and violative of equal protection because cocaine is not a narcotic drug?

2. Is the classification of cocaine with narcotics arbitrary and irrational so as to violate due process?

3. Is the statutory scheme for regulation of cocaine violative of due process or equal protection because it permits prosecutorial discretion to charge cocaine offenses under either AS 17.10 or AS 17.12?

4. Is criminalization of the personal use and possession of cocaine in the home an invalid infringement on the right to privacy?

Each of the seven defendants in these consolidated appeals was indicted under AS 17.10.010[5] which prohibits the possession, sale and distribution of narcotic drugs[6] as defined in AS 17.10.230,[7] and moved to dismiss the indictments[8] on a variety of constitutional grounds.

After a lengthy evidentiary hearing, the trial court entered a carefully detailed memorandum decision which dismissed the indictments and stated that the defendants could possibly have been charged with violations of AS 17.12.010.[9] Summarizing the testimony of the two witnesses and eight affidavits of experts presented by the defendants and the testimony of the three

1. Section I of the fourteenth amendment provides in part:
. . . No state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

2. Article I, section 1 of the Alaska Constitution provides in part:
. . . all persons are equal and entitled to equal rights, opportunities, and protection under the law . . . .
Article I, section 7 states in part:
No person shall be deprived of life, liberty, or property, without due process of law. . .

3. Article I, section 22 of the Alaska Constitution states in part:
*Right of Privacy.* The right of the people to privacy is recognized and shall not be infringed. . . .

4. Although the state has appealed from the lower court's holding that the classification of cocaine with narcotics is violative of due process and equal protection, we also consider additional arguments advanced by defendants below and now urged as alternative grounds for upholding the trial court decision.

5. AS 17.10.010 provides:
*Acts prohibited.* It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

6. Two defendants, Mueller and Sopko, were indicted for sale of the drug. The remaining five defendants were indicted for possession within and outside the home. Erickson was apprehended by Alaska State Troopers after picking up a package at the Anchorage International Airport which allegedly contained thirty-five grams of cocaine. Phillips was arrested for operating a motor vehicle while intoxicated. During a subsequent custody search, the police observed him removing from his pants pocket a small glass vial later found to contain cocaine. McVicker was found to be in possession of approximately 155 milligrams of cocaine when taken into a police interview room for a search in connection with a traffic offense. Two defendants, Laschober and Vasconcellos, were arrested in the apartment of Laschober's sister and indicted for possession.

7. AS 17.10.230(13) specifies:
"narcotic drugs" means coca leaves, opium, isonipecaine, amidone, isoamidone, ketobemidone, and every other substance having similar physiological effects . . . .

8. Defendant Erickson was actually tried and convicted of possession. He raised the equal protection and due process issues in his sentencing brief.

9. AS 17.12.010 provides:
*Acts prohibited.* Except as otherwise provided in this chapter, it is unlawful for a person to manufacture, compound, counterfeit, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, a depressant, hallucinogenic or stimulant drug.

witnesses called by the state,[10] the court found that:

> [I]t is beyond dispute that cocaine is unlike the opiates and compares with amphetamines. All of the scientific expert witnesses called by the petitioners and the State of Alaska agree on the fact that cocaine is not a narcotic for pharmacological purposes. The experts disagree on the dangerousness of cocaine use both to the user and to society.

It concluded that the classification of cocaine as a narcotic violated equal protection and due process guarantees of the Alaska Constitution.

While we find the case a close one and are convinced from the record and other reliable scientific sources that cocaine, as principally used today, is less deleterious than popularly believed, we have concluded that the legislation is valid; and, accordingly, we reverse.

## SCOPE OF APPELLATE REVIEW

Because our decision must necessarily rest to a large extent on scientific evidence concerning the nature and the effects of cocaine, we must at the outset assess the wisdom and propriety of considering on appeal materials which were not presented to the trial court.

In this case, the state has introduced numerous materials for the first time on appeal; and the defendants argue that our consideration should be limited to the evidence presented to the trial court. Reasons of judicial economy and fairness to the trial judge and litigants would compel us to agree with the defendants in most cases. Where, however, the validity of legislation having major social consequences is at stake, we conclude that an appellate court may be compelled to accept sources from outside the record.

Traditionally, a court's review of materials not contained in the trial record was justified through the use of judicial notice. The original concept of judicial notice comprised cases where the court took notice of facts which were "universally known and recognized"[11] or "within the knowledge of most men."[12] As the common knowledge requirement became fictionally expanded to include refreshing of judicial recollection, the scope of judicial notice was extended to encompass facts capable of certain verification.[13] The common thread between these two positions was the fact that, under either requirement, the information taken by notice was irrefutable. This has been and remains the standard with respect to the adjudicative facts in a case. Adjudicative facts, in the terminology of Professor K. C. Davis,[14] are those facts which explain who did what, when, where, how and with what motive and intent. In these appeals, we are

---

10. The testimony of these witnesses and affiants is summarized, *infra.*

11. *In re Buszta's Estate*, 18 Misc.2d 716, 186 N.Y.S.2d 192, 193 (Sur.Ct.1959).

12. *Rives v. Atlanta Newspapers, Inc.,* 110 Ga. App. 184, 138 S.E.2d 100, 104, *rev'd on other grounds*, 220 Ga. 485, 139 S.E.2d 395 (1964); *see also*, McCormick on Evidence, § 329 (2d ed. 1972).

13. Comment, The Presently Expanding Concept of Judicial Notice, 13 Vill.L.R. 528, 532 (1968).

14. Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv. L.R. 364, 402–10 (1942). *See also*, Davis, Judicial Notice, 55 Colum.L.Rev. 945, 952 (1955):
 Stated in other terms, the adjudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case. They relate to the parties, their activities, their properties, their businesses. Legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take. Legislative facts are ordinarily general and do not concern the immediate parties. In the great mass of cases decided by courts and by agencies, the legislative element is either absent, unimportant, or interstitial, because in most cases the applicable law and policy have been previously established. But whenever a tribunal is engaged in the creation of law or of policy, it may need to resort to legislative facts, whether or not those facts have been developed on the record.

not confronted with any conflict as to the adjudicative facts. Questions as to what various defendants did are not in issue.

Adjudicative facts are distinguished from what Professor Davis, followed by Professor McCormick,[15] call legislative facts. Legislative facts come into play when the court is faced with the task of deciding the constitutionality of a statute, statutory interpretation or the extension or restriction of a common law rule upon grounds of policy. These policy decisions, as in the case at hand, often hinge on social,[16] political,[17] economic,[18] or scientific facts,[19] most of which no longer fall within the classification of irrefutable. Cases involving such decisions [20] cannot be decided adequately without some view by the court of the policy considerations and background upon which the validity of a particular statute or rule is grounded.[21]

McCormick on Evidence, § 334 (2d ed. 1972), alludes to the proposition that the topic of judicial notice, particularly as to legislative facts, does not conveniently fit within the structured confines of the law of evidence, but rather is more appropriately categorized in the more general area of judicial reasoning.[22] A distinction must be made between evidence of the particular facts of a case, which can be accepted only through prescribed methods calculated to assure credibility, and those facts which are of greater policy significance in that they describe aspects of our larger environment and form the basis upon which adjudicative facts are evaluated. It is a slippery distinction at best; but it is one that has been drawn by Davis,[23] incorporated into the federal rules,[24] and at least implicitly recognized in nearly every situation where a court has been called upon to address a

**15.** McCormick on Evidence, § 331 (2d ed. 1972).

**16.** *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (recognition of brand of inferiority which segregated schools placed on minority).

**17.** *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (recognition of political disincentives to legislative cure for malapportionment).

**18.** *SEC v. Capital Gains Research Bureau, Inc.*, 300 F.2d 745, 750–51 (2d Cir. 1961) (judicial notice taken that advice tendered by small advisory service could not influence stock market generally), *rev'd*, 375 U.S. 180, 196, 84 S.Ct. 275, 285, 11 L.Ed.2d 237, 249 (1963) (judicial notice taken that the advice tendered could influence the market price).

**19.** *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954) (judicial notice of psychiatric learning pertinent to the scientific soundness of the right-and-wrong test of criminal insanity); *Ravin v. State*, 537 P.2d 494 (Alaska 1975) (judicial notice of scientific studies of nature and effects of marijuana; *see* n. 43 for works examined).

**20.** *See* Notes 16 through 19, *supra.*

**21.** An example of such a technique is the case of *Burns Baking Co. v. Bryan*, 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924). The question in that case was whether the Nebraska legisla-

ture, concerned about consumers being misled by confusing sizes of bread, could decree that bakers must bake bread by distinctively different weights and that a deviation of more than two ounces in the average weight per loaf in lots of twenty-five loaves would result in the baker's fine or imprisonment. A majority of the court found that the statute imposed an unreasonable burden on the baking industry—virtually eliminating unwrapped bread, since weight loss by evaporation could not be controlled without wrapping—and that the legislature could regulate consumer deception resulting from short-weighted bread by other means. Justice Brandeis dissented, stating that the central question was whether the legislative response to the problem of consumer fraud was reasonable in light of the facts available to the legislature. "We have merely to acquaint ourselves with the art of bread-making," he said. *Id.* at 520, 44 S.Ct. at 416. He then proceeded to set forth a highly comprehensive, seventeen-page compilation of data demonstrating the reasonableness of the response in view of the national problems of short-weighted bread. *Id.* at 517–34, 44 S.Ct. 412. This type of independent appellate research is often referred to as a "Brandeis Brief."

**22.** Thayer, Preliminary Treatise on Evidence at the Common Law, 278–79 (1898).

**23.** *See* Note 14, *supra.*

**24.** Fed.R.Evid. 201(a): "This rule governs only judicial notice of adjudicative facts."

question of policy in evaluating the rationality or reason behind a statute or rule.[25]

Here we are concerned with the attributes and effects of the drug cocaine. Our decision is therefore not based on the particular facts in this case but on matters of general scientific knowledge. We recognize that evaluation of scientific information at the appellate level is without the advantage of cross-examination of witnesses and the resulting increase in the reliability of the "facts" ascertained. In cases such as this, however, there are literally hundreds of scientific articles and numerous experts. An effort to present any substantial number of those experts in a courtroom would be prohibitively expensive and unduly time-consuming. Moreover, in the final analysis, it is questionable whether such an expanded hearing would reveal more reliable or higher quality information than is available by referring to authorities submitted in briefs by both sides, and, in appropriate cases, by additional research at the appellate level.

In the case before us, because counsel for both sides cited exhaustive sources, it is unnecessary for us to refer to additional materials. We thus are not presented with the question of whether the requirements of Civil Rule 43(a)(6)[d],[26] affording parties opportunity to respond, must be met. We do not believe, however, that the rule necessarily applies to "legislative" facts.

Appellate courts often consider evidence outside the record in reaching their decisions. While some courts do it more formally than others, the great weight of authority supports judicial discretion in this matter.[27] The United States Supreme Court has relied on material not presented to the trial court on numerous occasions.[28]

■ In this case, the trial court heard four days of testimony. Dr. Andrew T. Weil and Dr. Sanford J. Feinglass testified for the defendants. The state presented three expert witnesses—Mr. John T. Maher, Dr. John Griffith and Dr. Floyd E. Anderson. In addition, the state presented evidence regarding street prices of cocaine in

**25.** *See* Weinstein, Judicial Notice and the Duty to Disclose Adverse Information, 51 Iowa L.R. 807, 822–23 (1966).

**26.** Civil Rule 43(a)(6)[d] specifies:
A judge or a reviewing court taking judicial notice as above provided, of matter not theretofore so noticed in the action, shall afford the parties reasonable opportunity to present information relevant to the propriety of taking such judicial notice and to the tenor of the matter to be noticed.

**27.** *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 548, 44 S.Ct. 405, 406, 68 L.Ed. 841, 843 (1924); *Commonwealth v. D'Avella*, 339 Mass. 642, 162 N.E.2d 19, 21 (1959); *see generally*, McCormick on Evidence, § 331 (2d ed. 1972).

**28.** *See* Notes 16–18 and 21, *supra; see also, Ribnik v. McBride*, 277 U.S. 350, 359–75, 48 S.Ct. 545, 547–52, 72 L.Ed. 913, 917–24 (1928) (dissenting opinion of Justice Stone, in which Justices Holmes and Brandeis joined, examined data relating to unemployment conditions in reviewing legislation requiring that employment agencies be licensed and adhere to a schedule of fees); *Muller v. Oregon*, 208 U.S. 412, 419–20, 28 S.Ct. 324, 325, 52 L.Ed. 551, 555 (1908) (judicial notice of collection of data concerning working hours for women, submitted to the court in a brief by attorney, and later Justice, Louis D. Brandeis). Professor Kadish, in Methodology and Criteria in Due

Process Adjudication—A Survey and Criticism, 66 Yale L.J. 319, 360 (1957), states:
To some degree data of this kind [social, political, economic and scientific] has reached the Court through lower court direct testimony; but the principal access to it has been through the device of judicial notice, combined with the Court's independent researches or the presentation of factual data by counsel in the form of the Brandeis brief. (footnotes omitted)
In addition, Professor Weinstein, in Judicial Notice and the Duty to Disclose Adverse Information, 51 Iowa L.R. 807, 822–23 (1951), describes consideration of "legislative facts" as follows:
Information useful to the court in deciding what the rule of law ought to be is supplied in a variety of ways, including the "Brandeis brief" giving extensive factual background materials. The court acts creatively to make new law either in its interpretation of statutes or in extending prior case doctrine. Its problems in determining what is a sound rule are much like those faced by the legislature. A court should not expect each lawyer to assume the responsibility for giving all the relevant background on all sides of the issue with respect to such substantive questions. Even were the lawyer inclined to do so, there is no clear choice as to what data to present and how it should be presented.

Anchorage and the profitability of cocaine trafficking. Finally, the trial court also had before it the affidavits of eight scientists who have studied the pharmacological nature and scientific use of cocaine: Dr. Norman Zinberg, Dr. Lance Simpson, Dr. Andrew Weil, Dr. James Thorpe, Dr. Paul Lowinger, Dr. Robert Byck, Dr. Robert G. Newman and Dr. Richard Kunnes. Although we consider this evidence in evaluating the constitutional issues before us and defer to the trial court's experience in evaluating the credibility of witnesses,[29] we conclude that in cases involving scientific information the court cannot be limited to the evidence presented to the trial court. Where "legislative facts" are concerned, it must be free to avail itself of other scientific sources. Therefore, our decision will rest on all relevant and current information concerning cocaine. Where the authors of such works have not been subjected to cross-examination, we will weigh their data and conclusions with this fact in mind.

## NATURE AND EFFECTS OF COCAINE

Cocaine is a naturally occurring stimulant drug produced from the leaves of the coca bush, primarily from *Erythroxyion coca*, a species of flowering plant indigenous to the western hemisphere. The coca plant's natural environment is the hot, humid eastern slope of the Andes Mountains. It grows principally in Bolivia and Peru, although it may be found as far south as Chile and as far north as Colombia and Venezuela. Cocaine is an alkaloid which must be extracted from coca. While cocaine's history covers little more than a hundred years, the use of coca can be traced to at least the 6th Century A.D. It had religious significance to the Incas.[30] Early use in South America was confined to chewing the leaves in a mixture of lime substance, and it is still widely used

in this manner by Bolivian and Peruvian Indians. Allegedly, it has enabled the Indians to work under arduous conditions at high altitudes with inadequate diets. Coca leaves contain one-half to one percent cocaine, and oral ingestion results in a slower release of its effects than when the drug is taken by other means.[31]

Cocaine was successfully isolated and extracted in the 1880's. Initially, the new drug was greeted with great enthusiasm in Europe and in the United States. It was used as a local anesthetic particularly in eye, nose and throat surgery because it constricted blood vessels limiting bleeding in surgery. Also, cocaine became an ingredient in several patent medicine cure-alls, as well as in the original formula for Coca-Cola.

As with most recent "wonder drugs," initial widespread acceptance was increasingly tempered by the recognition that cocaine had undesirable side effects and could pose a severe health hazard.[32] Concern over the excesses of use of patent medicines utilizing cocaine became manifest with the emergence of higher standards for the practice of medicine. While many of its medical uses have been abandoned, cocaine continues to have some use as a local anesthetic.

It is undisputed that cocaine is not a narcotic under the pharmacological definition of the term. The term "narcotic" derives from the Greek word for numbness or stupor.[33] Narcotics are central nervous system depressants which create a physical dependence liability in the user. Opiates are a class of narcotics which tend to reduce and relieve pain. Narcotic use is characterized by tolerance, the need for increasing doses over time to maintain the same pharmacological effects, and by withdrawal—a pattern of symptoms appearing when an habitually-taken drug is discontinued sud-

**29.** Judge Carlson found grounds for questioning the objectivity of two of the state's witnesses.

**30.** Petersen, "History of Cocaine," National Institute on Drug Abuse, Research Monograph 13, *Cocaine: 1977*, 18 (1977).

**31.** Petersen, "Cocaine: An Overview," *Cocaine: 1977, supra* Note 30 at 5.

**32.** Petersen, "History of Cocaine," *Cocaine: 1977, supra* Note 30 at 28.

**33.** Webster's New International Dictionary of the English Language, 1627 (2d ed. 1960).

denly and relieved when the drug is reinstated. Narcotics are not self-limiting. Given an unlimited supply, the user can take the drug continuously. Narcotics, such as the opiates, act on an opiate receptor site in the brain. There is also a cross tolerance effect to opiates, meaning that any opiate can relieve abstinence syndrome created by dependence on another opiate.

The general motivations for opiate use are escape and an attempt to close out the rest of the world. Depressants are generally used by those who are seeking to disconnect themselves from their environment. Opiates are usually taken intravenously by needle.

The chemical structure of cocaine is unlike that of opiates, and it is not associated with tolerance or withdrawal syndrome. In contrast to opiates, cocaine is a stimulant. It produces an euphoria, a sense of intense stimulation and of psychic and physical well-being, accompanied by a reduced fatigue. There is scientific evidence that, when taken in moderate doses, it increases heart rate and blood pressure. It is not physically addictive and is generally considered less harmful than heroin or alcohol.

The non-medical use of cocaine occurs primarily by inhaling or "snorting" through the nose. A less common method of use is intravenous injection into the blood stream. The effects of the drug are rapid but of short duration. If injected, its major effects are generally dissipated after ten minutes; and, if taken nasally, after a half hour.

Users generally believe that it is safe and relatively free of undesirable side effects. Cocaine use does have adverse effects, however, even in small doses. When "snorted," it may cause inflammation of the nasal membranes. Intravenous injection is more dangerous, primarily because of the risks attendant with use of needles. Larger doses and heavier use by any method pose more significant risks. Dr. Petersen, in his article, "Cocaine: An Overview," states:

Its reputation for safety may be overstated since it is based on low doses taken relatively infrequently. Under conditions of heavier, more frequent use, adverse consequences may be considerably more common than generally believed.[34]

There is, apparently, wide individual variation in the psychological and physiological effects. With heavier use, a cocaine psychosis similar to paranoid schizophrenia has been described in scientific literature; and Dr. Andrew Weil indicated that cocaine can cause a toxic psychosis. Tactile hallucinations, involving a sensation of insects under the skin, is a common aspect of such cases. Paranoid delusions have been described, including fear of imaginary authority figures or a belief that one is being watched.[35]

Dr. Weil, in testifying about an adverse change in attitude toward cocaine that occurred in the latter part of the 19th Century, stated that, in a period of indiscriminate use, some individuals had very bad reactions to cocaine and became very anxious or excited or paranoid. "Some people went crazy briefly upon the administration of high doses of cocaine." He indicated that this occurred only in a small minority of those using cocaine but that it was a spectacular adverse effect. Indeed, it has been noted that:

Apart from clinical description and case reports, however, there have still been no systematic controlled studies to determine the level and frequency of cocaine use which leads to serious, adverse psychic effects such as those described. It is not known how common such paranoid symptoms are at various levels of use, the degree to which individual personality differences contribute to their development or whether they are a consequence of use if large enough quantities are used over a sufficiently extended period. Because present American use patterns are characterized by relatively in-frequent use of small quantities of the drug, serious adverse effects of use may be quite

34. Petersen, "Cocaine: An Overview," *Cocaine: 1977, supra* Note 30 at 9.

35. *Id.* at 11.

rare. In one recent study of recreational users 85 regular users (1 gram per month or more) recruited by means of newspaper ads were studied. None of these subjects were compulsive users in the sense described in the earlier literature. Although their self-reported experiences were generally positive (e. g., all reported euphoria in connection with use), negative effects were also indicated, such as restlessness, anxiety, hyper-irratability, and . . . paranoia. In this study, positive effects were reported on all occasions of use, with negative consequences experienced in 3–5 percent of them.[36]

Unlike marijuana, cocaine can cause death as a direct effect of its pharmacological action. Researchers in 1976 and 1977 collected data about cocaine-related deaths at twenty-seven study sites in the United States and Canada according to an article in the National Institute on Drug Abuse's Monograph on cocaine.[37] In that study of 62.9 million people, there were 111 fatalities in which cocaine apparently played a part; however, only twenty-six of the fatalities were attributable solely to cocaine.[38] The number of fatalities per year has increased markedly, however, probably as a result of increased usage.[39] Dr. Weil testified that, although the risk of death from central nervous system stimulants such as cocaine is a tiny fraction of the risk created by central nervous system depressants, such a result can occur under unusual circumstances.[40]

Dr. Sanford J. Feinglass, who testified for the defendants, indicated that the National Commission on Marijuana and Drug Abuse, for which he served as consultant, considered that alcohol is the drug with the greatest potential for abuse, followed by opiates and barbituates. The Commission rated cocaine as having a slightly higher potential for abuse than amphetamines, followed by marijuana, LSD and mescaline in descending propensity for abuse. Tobacco was not included in the scope of the Commission's work.

He believed that it was possible for a user of cocaine to develop a toxic psychosis but that the incidence would be extremely low. He stated that it was possible to have a lethal dose of cocaine. He testified as to reports of destruction or apparent destruction of the nasal mucosa with some associated bleeding and scabbing.

While cocaine has been anecdotally related to aggressive or criminal conduct, adequate evidence to assess its possible impact in these areas is absent.[41] Aside from the criminality involved in violation of drug laws, we have found no reliable scientific evidence linking cocaine usage to criminal conduct, although there is some indication that its stimulant effect may create a potential for crime and violence.[42]

Oddly enough, no tests seem to have been made as to the effects of cocaine on driving—one area in which it has been clearly shown that marijuana has adverse effects.[43] Dr. Weil was of the opinion that one who had experience with the effects of cocaine would drive normally but that one inexperienced with its use might have his driving ability impaired.

**36.** *Id.* at 11–12.

**37.** Finkle and McCloskey, "The Forensic Toxicology of Cocaine," *Cocaine: 1977, supra* Note 30 at 153.

**38.** *Id.* at 153–54.

**39.** Cocaine's presence in sudden unexplained deaths in the study population increased each year, from two in 1971 to fifty-eight in 1976 (the latter figure was extrapolated to December 1976, as the study ended in August). *Id.* at 159.

**40.** He testified, however, that the mechanism causing death from stimulants differs from that causing death from depressants.

**41.** Petersen, "Cocaine: An Overview," *Cocaine: 1977, supra* Note 30 at 13.

**42.** Grinspoon and Bakalar, *Cocaine, A Drug and Its Social Evolution*, 222–28 (Basic Books 1976).

**43.** *Ravin v. State, supra* Note 19 at 510.

There is a dispute in the evidence pertaining to whether cocaine is psychologically addictive.[44] Dr. Weil testified:

There is no question that people can be dependent on cocaine. I think that those people [45] were dependent on cocaine in the sense that a large proportion of their working energy went towards getting and using cocaine.

An appraisal of the effects of cocaine use is made difficult by the differing views expressed, ranging from those of ardent advocates to those of persons condemning it as one of the most demonic of drugs. The attitudes pertaining to the drug have seen dramatic shifts during different periods of time, as well as sharp reversals of opinion by individuals. For example, the Spaniards, upon discovering the use of coca leaves by the Incas, initially condemned it but later strongly advocated its use by the subjugated Indians because of its apparent effect in aiding arduous work.[46] Dr. Sigmund Freud, who had earlier used cocaine himself and considered it a wonder drug, became concerned after seeing a friend develop a cocaine psychosis. The friend, Ernst von Fleischl-Marxow, had an earlier morphine dependency which he tried to overcome with cocaine.[47] Many modern scientists have substantially changed their views pertaining to the drug, now believing it to be less harmful than previously conceived.[48]

Our review of sources concerning the drug indicate that there is still much to be learned. Many of the texts are singularly anecdotal and unscientific. Obtaining a true scientific evaluation is made tremendously difficult by the variations in methods of use, the relative purity of the drug, the manner in which it is combined with other substances, and the physical and psychological attributes of the user. A more intensive scientific analysis appears to be evolving at the present time; and a number of works have been published in the past year, indicating a more realistic appraisal.[49] The recently-issued Monograph, prepared by the National Institute on Drug Abuse, is an excellent consideration of the more advanced and scientific evaluations.[50]

## EQUAL PROTECTION

The defendants have mounted a weighty attack on cocaine's inclusion as a "narcotic drug" in AS 17.10.[51] It is argued that the classification is overinclusive because, from a pharmacological standpoint, cocaine is not a narcotic and should be classified under AS 17.12 [52] with amphetamines, which produce similar physiological effects. Since penal-

44. Dr. Weil, in affidavit, stated that:

. . . Cocaine does not produce a physiological dependence in the manner of opiates or alcohol or barbituates. While its regular use can be described as a habit, that habit is not as difficult to break as the habits that form around the uses of drugs like tobacco and coffee.

Dr. Paul Lowinger, in affidavit, said that cocaine " . . . can be habituating, although it is less so than the amphetamines." Dr. Robert G. Newman, in affidavit, stated that:

[c]ocaine does not cause physical dependence, even when used repeatedly and in large doses. Withdrawal symptoms do not result when a heavy user abruptly discontinues cocaine intake.

Dr. Richard Kunnes said that "Cocaine . . . is nonaddictive, with the user neither physically nor psychologically being tied to the drug."

45. By "those people," Dr. Weil was referring to persons previously addicted to morphine who were given cocaine therapy by the medical profession. He pointed out that American doctors around the time of the Civil War had created a class of morphine-dependent persons and attempted to alleviate the addiction by routine treatments with cocaine.

46. Petersen, "History of Cocaine," *Cocaine: 1977, supra* Note 30 at 19.

47. *Id.* at 23–25.

48. *See, e.g.,* Affidavit of Dr. Norman Zinberg.

49. *See, e.g.,* Grinspoon and Bakalar, *supra* Note 42; Ashley, *Cocaine, Its History, Uses and Effects* (Warner Books 1975); and *Cocaine: Chemical, Biological, Clinical, Social and Treatment Aspects*, Mule, ed. (CRC Press 1976).

50. *See* Note 30, *supra.*

51. *See* Notes 5 and 7, *supra.*

52. *See* Note 9, *supra.*

ties for the use and possession of narcotic drugs are, in many instances, more severe than those for amphetamines,[53] defendants contend that cocaine users are denied equal protection.

AS 17.10.010 [54] prohibits the use or sale of "narcotic drugs." The term "narcotic drugs" is defined in the act so that there is no question that possession and sale of cocaine is proscribed. AS 17.10.230(13) states that "narcotic drugs" shall mean "coca leaves, opium, isonipecaine, amidone, isoamidone, ketobemidone, and every other substance having similar physiological effects." "Coca leaves" is further defined as including cocaine,[55] and opium is defined as including "morphine, codeine and heroin." [56] With the exception of cocaine and coca leaves, all drugs classified as narcotics under AS 17.10 are natural or synthetic opiates.

We have previously discussed the tests to be used in determining questions of equal protection in Alaska.[57] In those cases, we expressed increasing dissatisfaction with the traditional two-tiered test for equal protection cases, which applies either the rational basis or the compelling interest standard. Finally, in *Isakson v. Rickey*,[58] the traditional model was altered. *Isakson* modified the test at the lower, non-fundamental right level by requiring a more exacting scrutiny. It implied, however, that the compelling state interest test would still be used when appropriate.

Under the rational basis test, in order for a classification to survive judicial scrutiny, the classification "must be reasonable, not arbitrary, and must rest upon some difference *having a fair and substantial relationship to the object of the legislation*, so that all persons similarly circumstanced shall be treated alike." (citation omitted; emphasis added)

It is this more flexible and more demanding standard which will be applied in future cases if the compelling state interest test is found inappropriate.[59]

Recently, we have reaffirmed application of this standard.[60]

██ In cases involving federal constitutional questions, where fundamental rights and suspect categories are at issue, we are bound by the "compelling state interest" standard unless that test is altered by the United States Supreme Court. In applying

---

**53.** The two defendants who were indicted for possession within the home suffer from the classification of cocaine with the narcotics in that the penalty for simple possession under AS 17.10.200 (a felony) is harsher than that provided under AS 17.12.110, which makes the crime a misdemeanor. Unlike AS 17.12, however, AS 17.10 does not distinguish between simple possession and possession for sale. Thus, it is not clear from the record whether defendants McVicker, Erickson and Phillips, who were found in possession outside the home, would be subject to misdemeanor or felony charges if cocaine were classified with amphetamines under AS 17.12. Defendant Sopko and Mueller will face felony charges regardless of the classification. Indeed, the particular sanctions providing for sale under AS 17.12 are potentially harsher than those set forth under AS 17.10.

**54.** Quoted at Note 5, *supra*.

**55.** AS 17.10.230(10) specifies:
"coca leaves" includes cocaine and any compound, manufacture, salt, derivative, mixture, or preparation of coca leaves, except derivatives of coca leaves which do not con-

tain cocaine, ecgonine or substances from which cocaine or ecgonine may be synthesized or made;

**56.** AS 17.10.230(11) states:
"opium" includes morphine, codeine, and heroin, and any compound, manufacture, salt, derivative, mixture, or preparation of opium, but does not include apomorphine or any of its salts;

**57.** *Isakson v. Rickey*, 550 P.2d 359, 362–63 (Alaska 1976); *Lynden Transport, Inc. v. State*, 532 P.2d 700, 706–07 (Alaska 1975); *State v. Adams*, 522 P.2d 1125, 1127 n. 12 (Alaska 1974); *State v. Wylie*, 516 P.2d 142, 145 n. 4 (Alaska 1973).

**58.** *Isakson v. Rickey, supra* Note 57.

**59.** *Id.* at 362.

**60.** *State v. Reefer King Co., Inc.*, 559 P.2d 56, 65 (Alaska 1977), applied the *Isakson* test to a classification differentiating "shore-based" from "floating" fish processors for purposes of taxation.

the Alaska Constitution, however, there is no reason why we cannot use a single test. Such a test will be flexible and dependent upon the importance of the rights involved. Based on the nature of the right, a greater or lesser burden will be placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective. Where fundamental rights or suspect categories are involved, the results of this test will be essentially the same as requiring a "compelling state interest"; but, by avoiding outright categorization of fundamental and non-fundamental rights, a more flexible, less result-oriented analysis may be made.[61]

■ Before proceeding, we must thus determine whether the rights of the defendants to possess, use and sell cocaine are of such a nature as to require application of the federal compelling state interest test. Applying the analysis we used in assessing claims that marijuana laws were invalid in *Ravin v. State*,[62] we hold that the defendants' particular rights to privacy and autonomy involved cannot be read so as to make the ingestion, sale or possession of cocaine a fundamental right. Moreover, the inclusion of cocaine users with opiate users does not involve a question of suspect classification such as race.[63]

■ Since this federal standard is inapplicable here, we turn to the methodology outlined earlier in this opinion and in *Isakson* for assessing equal protection claims under the Alaska Constitution. Initially, we must look to the purpose of the statute, viewing the legislation as a whole, and the circumstances surrounding it.[64] It must be determined that this purpose is legitimate, that it falls within the police power of the state.[65] Examining the means used to accomplish the legislative objectives and the reasons advanced therefore,[66] the court must then determine whether the means chosen substantially further the goals of the enactment. Finally, the state interest in the chosen means must be balanced against the nature of the constitutional right involved.

We thus shall first determine the purpose of AS 17.10 and, secondly, ascertain whether the inclusion of cocaine with opiates bears a sufficient relationship to that purpose. The answer to the first question will to a substantial extent dispose of the second.

A. The Purpose of the Statute:

Mounting their argument on the historical derivation of AS 17.10, the defendants contend that the Alaska legislature has regarded cocaine as a true narcotic in the pharmacological sense and that the concept of its dangerousness was linked to the false assumption that, like opiates, cocaine is habit-forming. They further point out that the state legislation is based on federal narcotics legislation and suggest that this history indicates that the purpose of the statute was to prohibit the use of depressant, physically addictive substances.

61. See Gunther, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.R. 1 (1972).

62. Supra Note 19.

63. See Isakson v. State, supra Note 57 at 363; cf. Ravin v. State, supra Note 19 at 502 (ingestion of marijuana not a fundamental right).

64. Isakson v. Rickey, supra Note 57 at 363.

65. See Ravin v. State, supra Note 19 at 509: [T]he authority of the state to exert control over the individual extends only to activities of the individual which affect others or the public at large as it relates to matters of public health or safety, or to provide for the general welfare. (footnote omitted) See also, Louis K. Liggett Co. v. Baldridge, 278 U.S. 105, 111–12, 49 S.Ct. 57, 58, 73 L.Ed. 204, 208 (1928), quoted in Ravin v. State, supra Note 19 at 509 n. 62: The police power may be exerted in the form of state legislation where otherwise the effect may be to invade rights guaranteed by the 14th Amendment only when such legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare.

66. Isakson v. Rickey, supra Note 57 at 363.

As is often the case in Alaska, ascertaining the purpose of the statute is difficult. In this case, as in others, committee reports, records of floor debate in the legislature or a statement of legislative purpose are lacking. Nevertheless, on the basis of the available materials,[67] we conclude that the legislature specifically intended to regulate the use and possession of cocaine, regardless of its particular pharmacological status, and that the purpose of the statute is to regulate drugs that have a potential for harm to health and welfare.

There is evidence suggesting that, at least until 1930, cocaine was regarded as the most serious drug threat.[68] From the earliest acts, it had been designated by name, and its restrictions and criminalization pre-dated its being defined as a narcotic.

The first federal drug regulation [69] affecting cocaine was the Pure Food and Drug Act of 1906, which restricted importation of drugs "otherwise dangerous to the health of the people of the United States." [70] It is notable that this legislation did not refer to "narcotics" but indicated a general concern about dangerous drugs.

The penalties of the act were light and did not involve imprisonment for first offenders.

In 1914, Congress passed two acts pertaining to the regulation of cocaine: the Harrison Act and the Narcotic Drugs Import and Export Act. The Harrison Act required those who produced, sold, distributed or gave away opium or coca leaves or their derivatives to register with the Internal Revenue Service and to pay a special tax. This Act was amended in 1919 to impose tighter controls. The Narcotic Drugs Import and Export Act prohibited export of cocaine to any country that did not regulate its own drug imports. In 1922, this act was amended to prohibit importing coca leaves except for medical uses; and it imposed substantially increased penalties.[71] For the first time, the 1922 Act defined the term "narcotic" as including cocaine. "Cocaine thus became a narcotic drug in the eyes of the law, whereas pharmacologically, it remained a non-narcotic drug." [72] There were no further changes until amendments of 1951 and 1956, which further increased penalties by imposing severe mandatory minimum sentences.[73]

67. Excellent accounts of the history of drug legislation appear in McLaughlin, Cocaine: The History and Regulation of a Dangerous Drug, 58 Cornell L.R. 537 (1973), and in *Cocaine: 1977, supra* Note 30.

68. 58 Cornell L.R. at 568. The author concludes from an analysis of early federal and state cocaine laws that cocaine was the most feared drug in the United States prior to 1930. Three specific arguments are advanced:
First, in terms of numbers, more states regulated cocaine than the opiates. In 1914, forty-six states had enacted some form of cocaine controls, whereas only twenty-nine states had comparable controls for the opiates. Even as late as 1930, there were more states which regulated cocaine than the opiates. Second, harsher penalties were often provided for cocaine violations. . . . Third, many provisions of federal law seemed to treat cocaine as an "especially dangerous drug." For example, the Harrison Act exempted from its coverage preparations containing minimal amounts of opium. No such exemption, however, was available for a preparation containing cocaine, no matter how small the amount. This special fear of cocaine may also explain its puzzling classification as a narcotic drug in the 1922 amendments to the Narcotic Drugs Import and Export Act, a classification contradicting pharmacological evidence. (footnotes omitted)

69. Prohibitions against use of drugs by states long antedated the federal laws. In 1887, Oregon prohibited the sale of opium or cocaine without a prescription; and, by 1914, forty-five additional states had laws restricting use of cocaine. 58 Cornell L.R. at 566.

70. 34 Stat. 772 (1906), *cited in* 58 Cornell L.R. at 560.

71. 58 Cornell L.R. at 560–63; *see also,* Petersen, "History of Cocaine," *Cocaine: 1977, supra* Note 30 at 29:
One of the reprehensible factors in curbing the use of cocaine and of cocaine-containing preparations in the period from 1900 to 1920 was the spector raised by the mass media of cocaine-crazed blacks committing heinous crimes.

72. 58 Cornell L.R. at 563.

73. *Id.* at 564–65.

In the meantime, most state laws were based on a Uniform Narcotic Drug Act promulgated by the Commissioners on Uniform State Laws in 1932. The Uniform Act followed the federal precedent and included cocaine within the definition of narcotic drugs.[74]

The most recent chapter in federal regulation is the Comprehensive Drug Abuse Prevention and Control Act of 1970,[75] which categorizes drugs according to their accepted uses and potential for abuse.[76] The term "narcotic drug" in the federal act is defined as including ". . . Opium, coca leaves, and opiates."[77] Significantly, "opiate," as well as any of its derivatives, is separately defined as ". . . any drug or other substance having an addiction-forming or addiction-sustaining liability similar to morphine . . . ."[78]

The fact that no such definition applies to coca leaves indicates that Congress was aware of the fact that cocaine is not similarly addictive. Yet, Congress still included coca and its derivatives under the definition of "narcotic drug." It thus would appear that Congress was aware of the physically addictive properties of certain drugs, but it elected not to use the pharmacological definition of narcotic drugs as being limited to drugs having such characteristics.

The Commission on Uniform State Laws has drafted a new model statute based on the federal law, the Uniform Controlled Substances Act. Cocaine is placed in Schedule II as a drug with an acceptable medical use but with a high potential for abuse.[79]

Looking to the Alaskan legislative history, we find that cocaine was first criminalized in Alaska in 1921.[80] At that time, cocaine was specifically named in a section which also proscribed various opiates. The Act was entitled: "To regulate the use, sale and possession of narcotic drugs."[81] In 1923, the legislature again listed the drugs individually.[82] The phrase "narcotic drugs" specifically included cocaine.[83] Although the statutory framework has changed somewhat, this listing of cocaine as a "narcotic drug" remains essentially the same.[84]

There is little legislative history indicating why cocaine has been listed as a narcotic. The 1923 and 1933 legislation referred to cocaine and other "habit-forming drugs . . . detrimental and dangerous to the individual and to public safety, health and morals."[85] The 1943 Act stated that " 'narcotic drugs' means coca leaves, opium . . . and every substance neither chemically nor physically distinguishable from them."[86] When the legislature adopted the Uniform

74. *Id.* at 567.

75. 21 U.S.C. § 801; *et seq.* (1974, as amended).

76. *Id.* at § 812.

77. *Id.* at § 802(16)(A).

78. *Id.* at § 802(17).

79. 58 Cornell L.R. at 571–72; *see also*, 21 U.S.C. § 812 (1974, as amended).

80. SLA 1921, Chapt. 17. There is an early vague reference to adulterating ". . . for the purpose of sale, any drug or medicine in such manner as to render the same injurious to health . . ." or ". . . knowingly sell[ing] . . . any adulterated drug or medicine. . . ." Carter, The Laws of Alaska, § 158 (1900). The law was derived from an Oregon law of 1864 and was included in the 1913 Compiled Laws under a chapter entitled "Offenses Against the Public Health."

See also, Hill's Ann.Laws § 1980; The Compiled Laws of the Territory of Alaska, § 2038 (1913). We have found no cases under this statute; and it is not possible to ascertain whether it was intended to proscribe the sale of cocaine, which is an extraction from coca and might conceivably be considered an adulteration.

81. SLA 1921, Chapt. 17. Maximum penalties for first offenders were a $250.00 fine, 100 days imprisonment or both.

82. SLA 1923, Chapt. 62, § 1.

83. *Id.* at § 2. ·

84. *See* CL 1933, § 1270; SLA 1943, Chapt. 6, § 1(14) (Uniform Narcotic Drug Act); ACLA 1949, § 40–3–1(14); AS 17.10.230(13).

85. SLA 1923, Chapt. 62, § 1; CL 1933, § 1275.

86. SLA 1943, Chapt. 6, § 1(14).

Narcotic Drug Act[87] in 1943,[88] it heard the remarks of a Treasury Enforcement representative in support of the law. There is no indication why the legislature continued to classify cocaine as a narcotic or whether they ever considered the issue.[89]

In 1968, the legislature removed marijuana from its then existing classification with cocaine and opiates and created the current prohibition against possession and sale of certain hallucinogenic, depressant and stimulant drugs.[90] Cocaine, however, remained classified as a narcotic, just as it had been for nearly fifty years.[91]

■ From this summary of Alaska legislation, it appears that from 1921, cocaine and opiates were regulated by name. The later definition of narcotics includes cocaine, but it gives no clear indication of what the legislature intended to mean by use of the term "narcotics." A legislature is free to define terms for purpose of legislation, even though it does not follow a pharmacological or dictionary definition.[92] In fact, one of the prime purposes of legislative definitions in criminal acts is to indicate specifically what the legislature intends to prohibit.

We believe that Chief Justice Richardson's comments in State v. Kanter, 53 Haw. 327, 493 P.2d 306, 308 (1972), pertaining to a similar definitional problem are pertinent:

The legislature has a broad power to define terms for a particular legislative purpose, and the courts, as a general rule of construction, are bound to follow legislative definitions of terms rather than commonly accepted dictionary, judicial or scientific definitions. . . . We think the requirements of due process place some limitation on the manner in which a legislature may use words. If we believe that the use of the word narcotic to include marihuana were so misleading as to confuse legislators in their law-making activities or to confuse persons of common understanding in their effort to determine whether the possession of marihuana constitutes a crime, it would clearly be our duty to declare the unconstitutionality of the statute. (citations omitted; footnote omitted)

■ The opinion stated that the word "narcotic" in popular usage included marijuana. We believe that the word "narcotic" in common usage includes ˙cocaine. The defendants have the severe burden of overcoming the fact that cocaine is specifically mentioned from the earliest enactments of the Alaska and federal statutes. Despite this fact, defendants would have us conjecture that the legislature never would have proscribed its use had it known that its allegedly harmful effects were not the same as those of opiates. It seems more logical to us that, from the outset, the legislature intended to outlaw drugs that were considered to be harmful to the health and

---

87. Regarding the origin of the Uniform Act, it has been suggested that:

[T]he Harrison Act's masquerade as a revenue measure required residual state legislation in order to effectuate full prohibition of the narcotics trade in America.

Bonnie & Whitebread, The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of Marijuana Prohibition, 56 Va. L.R. 971, 1028 (1970). The Bureau of Narcotics sought to insure passage of the Act in each state through lobbying and testifying before the legislatures and propagandizing in channels of public opinion. Id. at 1034–38.

88. SLA 1943, Chapt. 6.

89. 1943 SJ 65; 1943 HJ 170.

90. AS 17.12.150(4). Although marijuana remains classified under AS 17.12, a separate schedule of penalties was enacted in 1975. AS 17.12.110(d), (e) and (f).

91. It is also notable that the legislature has stated that the following is a ground for divorce: "addiction of either party, subsequent to the marriage, to the habitual use of opium, morphine, cocaine, or a similar drug." AS 09.-55.110(9). This provision was added in 1957. SLA 1957, Chapt. 136.

92. State v. Kanter, 53 Haw. 327, 493 P.2d 306, 308 (1972) (legislature may define "narcotic" to include "marijuana"); Sterling v. City of Philadelphia, 378 Pa. 538, 106 A.2d 793 (1954) (city ordinance may define "business" to include "profession" such as law for purposes of mercantile license tax); see generally, Sands, Sutherland Statutory Construction, §§ 27.01–27.02 (4th ed. 1972).

welfare of society and that it considered cocaine to be one of such drugs.

We doubt that members of the legislature were concerned with whether or not it was a stimulant or depressant, or even whether it was psychologically habituating rather than physically addictive. This construction is bolstered by the presumption of validity to which a duly-enacted law is entitled.[93]

While it is clear that cocaine is not a narcotic pharmacologically, it seems equally clear that the legislature intended to proscribe that drug and to impose similar penalties for its use as for opiates. We conclude that the legislature intended to regulate drugs that adversely affect the health and welfare of society. Only if cocaine is not harmful to health and welfare of society to any substantial degree, could we hold this purpose to be invalid.

We shall therefore attempt to ascertain whether the inclusion of cocaine with opiates bears a fair and substantial relationship to what we have determined to be the legislative purpose.

B. Effects of Cocaine:

The testimony introduced at the trial generally painted the picture of cocaine as a relatively benign drug. Yet, giving due deference to the trial judge's appraisal of the witnesses, we find sufficient evidence of

potential for harm to justify inclusion of cocaine with opiates.

Dr. Andrew Weil indicated in his testimony that, with indiscriminate use, some individuals had very bad reactions to cocaine, including anxiety and paranoia; that people can be dependent on cocaine; that cocaine can cause toxic psychosis and death under unusual circumstances; that there is cause for concern over the recent increase in use of cocaine;[94] and that the potential for abuse between cocaine and amphetamines is similar.

In fairness, we hasten to point out that those adverse comments pertaining to the drug have been culled from Dr. Weil's entire testimony which over-all gives the impression of a drug involving minor adverse problems, less than those resulting from the use of either alcohol or tobacco.[95]

Dr. Sanford J. Feinglass, also a defense witness, gave similar testimony regarding cocaine's potential for harm and rated it as having a slightly higher potential for abuse than amphetamines.

Looking to sources other than the testimony at trial, the following indications of harmfulness are summarized from the National Institute of Drug Abuse's Monograph:[96]

1. Although cocaine as typically used in the United States at present poses only a limited hazard, it can be physically danger-

---

**93.** *See, e. g., McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961): "State legislatures are presumed to have acted within their constitutional power . . . ."

**94.** With reference to increased usage of cocaine, he stated:

I think there are certain reasons for concern. I happen to be in favor of responsible use of drugs and in favor of social controls of drug use, that is, I think that . . . the more people we have in our society who use drugs irresponsibly and unconsciously, I think that those are health problems and—and societal problems so I think when any new drug begins to spread that there is always some cause for concern about whether people are going to learn how to use it intelligently. So

I am watching what's happening with cocaine and I'm interested to what's happening. . . . I don't think it's a plague or a scourge but I think it's a matter . . . to watch and see what happens with it.

**95.** The American Cancer Society estimates 89,000 deaths will be caused by lung cancer in 1977, of which 80 percent will be related to cigarettes. American Cancer Society, "1977 Cancer Facts and Figures" at 19. Dr. Luther Terry, former Surgeon-General of the United States, has estimated that 250,000 deaths are caused or contributed to annually by cigarette smoking. These and other statistics regarding the societal harm caused by tobacco are cogently stated in Notes and Comment, "The Talk of the Town," The New Yorker (June 27, 1977).

**96.** *See* Note 30, *supra.*

ous in ways that marijuana cannot.[97] Unlike marijuana, cocaine can cause death as a direct effect of the pharmacological action of the drug.[98]

2. In studies of animals, when aggression has been elicited by environmental events, cocaine may increase or decrease the aggression.[99] A reasonable conclusion from animal research that is applicable to humans is the fact that severe cocaine intoxication is self-induced when the intravenous route of administration is used and access to the drug is unlimited.[100]

3. Most researchers agree that the pleasurable effects diminish with continued use of cocaine and are replaced by an increasing number of adverse effects which can only be alleviated through its cessation.[101]

4. One of the most consistent findings is that prolonged and excessive use is associated with tactile hallucinations of animals, bugs or insects moving under the skin.[102]

5. Chronic users can experience negative effects, such as nervousness and irritability, perceptual disturbances, nasal problems, situational sexual impotency and fatigue or lassitude when the effects abate. These effects were experienced in approximately five percent of the intoxications.[103]

6. The toxicity of cocaine approximately parallels that of amphetamines and is manifested by depressions, psychological depend-

ence upon cocaine,[104] acute anxiety reactions to cocaine and cocaine psychosis.[105] The drug is viewed as one of moderately high abuse similar to that of amphetamines.

However, if the drug were more readily available at a substantially lower cost, or if certain socio-cultural rituals endorsed and supported the higher dose patterns, more destructive patterns of abuse could develop.[106]

Cocaine is not a benign drug, a fact which is clearly supported by its known pharmacology.[107]

## CONCLUSIONS AS TO EQUAL PROTECTION

In our review of the evidence and sources referred to us, we have selected from the testimony in this case, from the National Institute on Drug Research Monograph and from other sources, portions indicating harmful attributes of cocaine. We have not attempted to give an over-all evaluation of the drug.

In *Ravin v. State*, we stated that "[i]t is not the function of this court to reassess the scientific evidence in the manner of a legislature" and that "a holding that a legislative enactment is invalid cannot rest on a debatable medical issue." [108]

Attacks on legislative classification of cocaine as a narcotic have uniformly been rejected by the federal courts,[109] and no

97. Petersen and Stillman, "Introduction," *Cocaine: 1977, supra* Note 30 at 1.

98. Petersen, "Cocaine: An Overview," *Cocaine: 1977, supra* Note 30 at 12.

99. Woods, "Behavioral Effects of Cocaine in Animals," *Cocaine: 1977, supra* Note 30 at 66.

100. *Id.* at 84.

101. Siegel, "Cocaine: Recreational Use and Intoxication," *Cocaine: 1977, supra* Note 30 at 122.

102. *Id.*

103. *Id.* at 129.

104. Wesson and Smith, "Cocaine: Its Use for Central Nervous System Stimulation Including Recreational and Medical Uses," *Cocaine: 1977, supra* Note 30 at 139.

105. *Id.* at 139, 141.

106. *Id.* at 150.

107. Finkle and McCloskey, "The Forensic Toxicology of Cocaine," *Cocaine: 1977, supra* Note 30 at 154.

108. *Ravin v. State, supra* Note 19 at 505 n.44, quoting in part, *United States v. Thorne*, 325 A.2d 764 (D.C.C.A.1974).

109. Cases in which classification of cocaine in Schedule II of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 812 (1974, as amended), has been upheld are: *United States v. Marshall*, 532 F.2d 1279, 1287–88 (9th Cir. 1976); *United States v. Smaldone*, 484 F.2d 311, 319–20 (10th Cir. 1973); *United States v. Castro*, 401 F.Supp. 120 (N.D.Ill.1975); *United States v. Umentum*, 401 F.Supp. 746,

reported state cases invalidating laws because of such classification have been called to our attention.[110]

We conclude that there is ample, respectable scientific evidence of harm or potential harm from the use of cocaine to sustain the legislature's inclusion of cocaine in its classification of narcotics under the provisions of AS 17.10. Thus, the legislative goal is legitimate, and the classification at issue is substantially related to that goal.

## DUE PROCESS

■ What we have said with reference to equal protection largely disposes of the due process argument. This argument is based on the conclusion that the classification of cocaine as a narcotic is incorrect, rendering the legislation irrational and without an objective basis in fact. The argument depends upon the use of the pharmacological

748–49 (E.D.Wis.1975), aff'd, 547 F.2d 987 (7th Cir. 1976); *United States v. Amidzich*, 396 F.Supp. 1140, 1147 (E.D.Wis.1975); *United States v. Miller*, 387 F.Supp. 1097, 1098 (D.Conn.1975); *United States v. Hobbs*, 392 F.Supp. 444, 446–47 (D.Mass.1975); *United States v. DiLaura*, 394 F.Supp. 770, 772–74 (D.Mass.1974); *United States v. Brookins*, 383 F.Supp. 1212 (D.N.J.1974), aff'd, 524 F.2d 1404 (3d Cir. 1975). These cases, however, applied the "rational basis" test enunciated in *United States v. Carolene Products Co.*, 304 U.S. 144, 153–54, 58 S.Ct. 778, 784, 82 L.Ed. 1234, 1242 (1938). We note that, in two instances, state courts have held laws classifying marijuana as a "narcotic" to be invalid. *People v. Sinclair*, 387 Mich. 91, 194 N.W.2d 878 (1972); *People v. McCabe*, 49 Ill.2d 338, 275 N.E.2d 407 (1971).

110. The only state case of which we are aware striking a cocaine law based on improper classification is the unreported case of *Commonwealth v. Miller*, No. 7734 (Mass.Mun.Ct., Roxbury District 1977), which invalidated the classification of cocaine as a narcotic on due process grounds. In that case, called to our attention by the defendants, the state introduced no testimony; and the judge based his decision solely on evidence presented by the defendants. The petition for extraordinary relief to the Supreme Judicial Court of Massachusetts was denied, since the Commonwealth had no right to appeal under the circumstances. Justice Wilkins, in his memorandum denying the petition, expressly stated that the issue of the constitutionality of the cocaine law was not before him. *Commonwealth v. Miller*, No. 76–532 (Mass. 1977).

definition of narcotics. As we have set forth above, we do not believe that the legislature is so restricted in defining the term. When viewed from the over-all legislative purpose of preventing the use of a drug harmful to the health and welfare of society, we cannot say that the classification is so irrational or arbitrary as to violate due process.[111]

## PROSECUTORIAL DISCRETION

■ It is contended that the statutory scheme for regulation of cocaine is violative of due process and equal protection because it permits prosecutorial discretion to charge cocaine offenses under either AS 17.10 or AS 17.12, which authorize different degrees of punishment. Because we construe AS 17.12 as not including cocaine, it is unnecessary to determine the constitutional implications of the prosecutorial discretion issue.[112]

Our attention has been directed by the state to the unreported California Superior Court decision in *People v. Kizer, et al.* (Cal.Sup.Ct., Santa Clara Co., June 13, 1977). The thirty-three defendants involved in the cases challenged the constitutionality of California Health and Safety Code sections regarding cocaine. It was contended that cocaine was misclassified as a narcotic, that total ban on use or sale or possession was unreasonable, and that such ban was violative of defendants' right of privacy. Additionally, defendants argued that the classification of cocaine with heroin and the imposition of more severe punishment for distribution of cocaine than for distribution of amphetamines were a denial of equal protection. Cruel and unusual punishment and due process attacks were also advanced.

The California court concluded that the statutory provisions were not unconstitutional. Hearing the testimony of several witnesses and examining a variety of reference materials (many of which are cited by counsel in this case), it found that cocaine was a powerful and toxic drug, harmful both to the user and to other people. It further found that widespread legal availability of cocaine would lead to more adverse effects on society than currently exist.

111. *See Bachner v. Pearson*, 479 P.2d 319, 333–34 (Alaska 1970); *Green v. State*, 462 P.2d 994, 996–97 (Alaska 1969).

112. We note, however, that where the same conduct can be penalized with varying degrees of severity, serious equal protection questions are raised. *See generally*, Berger, Equal Pro-

As indicated previously, AS 17.10.010 [113] criminalizes the possession and sale of narcotics, and AS 17.10.230(13) defines cocaine as a narcotic drug. AS 17.12.010 [114] prohibits the possession and sale of depressant, hallucinogenic and stimulant drugs. AS 17.12.150(3) defines "depressant, hallucinogenic or stimulant drug" to mean:

(A) cannabis, psilocybin, dimethyltryptamine, lysergic acid diethylamide, and every other substance having similar physiological effects;

. . . . .

(C) a drug which contains amphetamine or any of its optical isomers; or a substance which has been designated by the commissioner as habit forming or dangerous because of its stimulant effect on the central nervous system; or

(D) a drug which contains any quantity of a substance which the commissioner, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect . . . . .

Pursuant to this statutory authority and that granted by AS 17.12.040,[115] the Commissioner of Health and Social Services has listed numerous drugs by name.[116] Cocaine is not among the drugs listed by the Commissioner, nor does it appear specifically in

AS 17.12.150(3). The regulations do contain the following language, however:

Any combination of depressant, stimulant, or hallucinogenic drugs, not listed by name or trade name in this chapter, that is of a composition substantially similar to any of the drugs or substances listed in this chapter is also subject to AS 17.12. . . . [117]

It is argued that AS 17.12 would permit cocaine prosecution under the general language relating to "similarity" found in AS 17.12.150(3) and 7 AAC 32.010(b).

This court has twice commented on the language of and relationship between AS 17.10 and AS 17.12. In *Casey v. State*,[118] defendant was charged with possession of numorphan under AS 17.10 on the theory that it was a drug having "similar physiological effects" to those identified specifically as narcotics by the statute.[119] Because the state had presented inadequate evidence of the physiological effects of the enumerated drugs, the conviction was reversed. We therefore were not required to address the constitutionality of the statutory language. Nevertheless, citing *Harris v. State*,[120] and *Marks v. City of Anchorage*,[121] we stated:

[I]f we were to reach the issue of whether the phrase "having similar physiological effects" is unconstitutionally vague,

tection and Criminal Sentencing: Legal and Policy Considerations, 71 Nw.U.L.R. 29, 46–47 (1976). *See also, Berra v. United States*, 351 U.S. 131, 135–40, 76 S.Ct. 685, 688–691, 100 L.Ed. 1013, 1018–21 (1956) (Black and Douglas, JJ., dissenting) (serious constitutional questions where prosecutor could charge misdemeanor or felony for filing false and fraudulent income tax return; majority held issue not properly raised); *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316, 318 (1975):

A statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws.

**113.** AS 17.10.010 is set forth in Note 5, *supra*.

**114.** AS 17.12.010 is set forth in Note 9, *supra*.

**115.** AS 17.12.040 provides in part:

(a) The Commissioner may promulgate regulations necessary to carry out the purposes of this chapter and to secure effective enforcement of its provisions.

(b) The Commissioner shall, by regulation, promulgate a list of drugs which contain . . a quantity of any other substance which is habit forming, dangerous, or has a potential for abuse because of its depressant or stimulant effect on the central nervous system or because of its hallucinogenic effect.

**116.** 7 AAC 32.020, 32.030 and 32.040.

**117.** 7 AAC 32.010(b).

**118.** 509 P.2d 285 (Alaska 1973).

**119.** *See* Note 7, *supra*.

**120.** 457 P.2d 638, 647 (Alaska 1969).

**121.** 500 P.2d 644, 650 (Alaska).

we would have grave doubts as to its constitutionality.[122]

In a series of cases, this court has set forth three relevant considerations for determining whether a statute is void for vagueness.[123] Most recently in *Larson v. State*,[124] we stated:

The first [consideration] is whether [the statute] is so broad that it may restrict the exercise of first amendment rights. . . . The second consideration is whether the statute gives adequate notice of the conduct that is prohibited.[125] The third consideration is whether the statute is drawn so imprecisely that it creates a danger of arbitrary enforcement. (citations and original footnotes omitted)

While *Casey v. State*[126] speaks to the second vagueness consideration (ambiguous language), *Speas v. State*[127] addresses the problem of arbitrary or capricious enforcement. Noting the "considerable overlap" between AS 17.10 and AS 17.12,[128] which would give the district attorney the option of charging possession or use of certain drugs under either chapter, we recognized that defendants engaging in the same conduct might be subject to inequitable and capricious treatment. We did not, however, find it necessary to decide the equal protection and due process issues. Speas was

convicted of illegal use of morphine which, like cocaine, is specifically prohibited under AS 17.10 but is not designated by the Commissioner for inclusion under AS 17.12. We concluded that, unless morphine were so designated, an indictment under AS 17.12 would be impermissible.[129]

Similarly, cocaine is specifically regulated by name in AS 17.10, and we believe that an indictment for its possession or sale under AS 17.12 would be impermissible unless cocaine were designated by name under the regulations authorized by that statute. We do not believe that the phrase "of composition substantially similar" in 7 AAC 32.-010(b) can include cocaine. Indeed, this language is even broader than that noted in *Casey v. State*[130] ("similar physiological effects"); since, as the testimony of the experts suggests, the composition of a particular drug can apparently be viewed on several different levels.[131]

Moreover, the phrase used in the regulation is at variance with the statutory provision authorizing the regulation, AS 17.12.-040(b). That section refers to drugs which are "habit-forming" or "dangerous" or have a "depressant or stimulant . . . or hallucinogenic effect."[132] The list is to be based on the effects of the drugs, not on

**122.** *Casey v. State, supra* Note 118 at 266 n.2.

**123.** *Larson v. State*, 564 P.2d 365, 371–72 (Alaska 1977); *Anderson v. State*, 562 P.2d 351, 355–58 (Alaska 1977); *State v. Marathon Oil Co.*, 528 P.2d 293, 297 (Alaska 1974); *Stock v. State*, 526 P.2d 3, 7–8 (Alaska 1974); *Marks v. City of Anchorage, supra* Note 121 at 646; *Harris v. State, supra* Note 120 at 647.

**124.** *Supra* Note 123 at 371–72.

**125.** The notice requirement embodies notions of fundamental fairness. Long ago, the United States Supreme Court said that:
a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.
*Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). *See, e. g., Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972); *Lanzetta v. New Jersey*, 306

U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939); *State v. Martin*, 532 P.2d 316, 323 (Alaska 1975) (Erwin and Rabinowitz, JJ., concurring); *Marks v. City of Anchorage, supra* Note 121 at 646.

**126.** *Supra* Note 118.

**127.** 511 P.2d 130, 134 (Alaska 1973).

**128.** The opinion specifically compared AS 17.-10.230(10)–(13) with AS 17.12.150(3)–(4). 511 P.2d at 134 n.15.

**129.** *Speas v. State, supra* Note 127 at 134 n.15.

**130.** *Supra* Note 126.

**131.** For example, Dr. Griffith testified that cocaine and methylphenidate have different molecular structures and, in this respect, are not similar in composition, although they have similarities in other respects.

**132.** *See* Note 115, *supra*.

their "composition." Like a court, most people are not familiar with scientific terminology and molecular chemistry. Users of cocaine may be aware of its physiological effects and of its stimulant properties similar to those of amphetamines, but most will not be aware of its composition. We thus have grave doubts as to the authority of the Commissioner to proscribe drugs based on their similarity of composition to named drugs.

 In any event, since cocaine is specifically designated in AS 17.10, we do not believe that the legislature, in the absence of naming it in AS 17.12, intended it to come under the terms of the latter statute. This conclusion is bolstered by our duty to construe a statute so as to avoid dangers of unconstitutionality.[133] As we have indicated previously, if cocaine were to be punishable under both statutes, there would be a strong argument against the validity of the statutes based on the prosecutorial discretion available. We conclude that cocaine does not come within the provisions of AS 17.12.

### RIGHT TO PRIVACY

 In Ravin v. State,[134] this court held that the state could not bar the personal use and possession of marijuana in the home. In view of the relative harmlessness of the drug, the individual's right to privacy under the Alaska Constitution was found to outweigh the state interest in regulation. Defendants contend that the reasoning of Ravin also applies to the non-commercial use and possession of cocaine and additionally argue that the constitutional right to privacy guarantees some reasonable access to the drug for personal and social use. The right to privacy argument is urged as an alternative ground for upholding the dismissal of the indictments.

We pointed out in Ravin, however, that:

We do not mean by this that a person may do anything at anytime as long as the activity takes place within a person's home. There are two important limitations on this facet of the right to privacy. First, we agree with the Supreme Court of the United States, which has strictly limited the Stanley [v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969),] guarantee to possession for purely private, non-commercial use in the home. And secondly, we think this right must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely.[135]

The question presented to us is thus whether the effects of cocaine are sufficiently similar in lack of harmfulness to marijuana so as not to be a serious hazard to health and welfare. With reference to marijuana, we stated in Ravin:

It appears that the use of marijuana, as it is presently used in the United States today, does not constitute a public health problem of any significant dimensions. It is, for instance, far more innocuous in terms of physiological and social damage than alcohol or tobacco.[136]

We have found no authorities which state that the effects of cocaine are less harmful than marijuana, and it seems clear that cocaine is substantially more of a threat to health and welfare.[137] Unlike marijuana, cocaine can cause death as a direct effect of the pharmacological action of the drug.[138]

Grinspoon and Bakalar in their recently published work Cocaine: A Drug and Its

133. Larson v. State, supra Note 123 at 372; State v. Martin, supra Note 125 at 321; Hoffman v. State, 404 P.2d 644, 646 (Alaska 1965).

134. Supra Note 19.

135. Ravin v. State, supra Note 19 at 504.

136. Id. at 506.

137. See discussion of harmful effects of cocaine, supra. Even defendants' witness Dr. Feinglass rated cocaine's potential for abuse as substantially higher than that for marijuana.

138. Petersen, "Cocaine: An Overview," Cocaine: 1977, supra Note 30 at 12.

*Social Evolution*, have a chapter on the "Abuse Potential of Coca and Cocaine: The Policy Debate." They state:

> Considering only its psychopharmacological effects, we can say that cocaine certainly has some potential for producing crime and violence.[139]

They indicate that cocaine can have similar effects to amphetamines, which they clearly relate to aggressive behavior,[140] although cocaine is probably less dangerous than alcohol, barbiturates or amphetamines.[141] The authors list seven potential types of harm resulting from the use of cocaine, namely: acute psychological effects, acute physical effects, chronic psychological effects, chronic physical effects, crime and violence, loss of psychomotor control and an economic and social burden on society.[142] The summary indicates a substantial poten-

tial for harm, although that potential is significantly reduced in situations of occasional social use by inhalation.

 We find that there is a sufficiently close and substantial relationship between the means chosen to regulate cocaine and the legislative purpose of preventing harm to health and welfare so as to justify the prohibition of use of cocaine,[143] even in the home. Having so concluded, it follows that we reject counsel's argument that the right of privacy permits reasonable access to the drug for personal and social use.[144]

## CONCLUSION

We conclude that the classification of cocaine with narcotics is not violative of equal protection or due process; that cocaine of-

---

**139.** Grinspoon and Bakalar, *supra* Note 42 at 224.

**140.** *Id.* at 225.

**141.** *Id.* at 228.

**142.** *Id.* at 228–29:
(1) Acute psychological effects: psychosis seems to be rare in recreational use, at least among sniffers; the crash is apparently not so hard a landing as the amphetamine crash; the most common problems are insomnia, irritability, and anxiety;
(2) Acute physical effects: overdose death is apparently rare, although this judgment must be qualified by reference to drug mixtures and inadequate reporting; deaths in surgery were at one time more common than deaths on the street, or perhaps only better reported; severe nonfatal acute poisoning from sniffing is probably rare, from injection not so rare; alcohollike or barbituratelike loss of motor control does not occur;
(3) Chronic psychological effects: cases of demoralization and general deterioration with periodic psychoses, like those described by literary men and physicians in the early years of the twentieth century, are apparently less common today but would presumably be more so if cocaine were more freely available;
(4) Chronic physical effects: the most common ones today are rhinitis and weight loss; if the drug were more freely available there would probably be some abuse causing serious malnutrition and debilitation; evidence of brain damage in coca chewers is inconclusive and not based on any observed organic pathology;
(5) Crime and violence: we have discussed this. . . . .

(6) Loss of psychomotor control leading to accidents that hurt others: as we have implied, cocaine in acute doses would rarely cause this, although the overreaction of a paranoid abuser to a fancied persecution might have a similar result;
(7) Economic and social burden: insofar as it is possible to estimate this at all, we are inclined to say that cocaine would not become as great a social problem as many other less restricted potentially dangerous instruments, pharmacological and other.

**143.** We have here applied the same standard set forth in *Ravin, supra* note 19 at 498.

**144.** While we agree with the concurrence that, in the context of this case, our privacy analysis dictates the same result as due process, we do not believe that we are thereby diluting Alaska's constitutionally recognized right to privacy. Neither the right to ingest a particular substance nor the more significant right to such autonomy in the home is absolute, since each must yield to the interests of other societal members in health and safety. *See Ravin v. State, supra* Note 19 at 504. Where the right to privacy is manifested in terms of interests more squarely within personal autonomy, the balance requires a heavier burden on the state to sustain the legislation in light of the right involved. *See, e. g., Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 474–80 (Alaska 1977). The privacy interest in the present case is the same interest involved in *Ravin v. State, supra.* Here, however, the state has made a sufficient showing of societal risk to tip the balance in favor of constitutionality.

fenses are not included in the prohibitions of AS 17.12 so that questions of prosecutorial discretion need not be addressed; and that criminalization of the personal use and possession of cocaine in the home does not constitute an invalid infringement on the right of privacy.[145]

In deciding the issues in this case, we have carried out our traditional appellate functions with a keen appreciation of the limits that the doctrine of separation of powers places on the judicial branch. Nevertheless, we do recommend that the legislature review its treatment of cocaine in light of modern scientific evidence.

REVERSED AND REMANDED.

MATTHEWS, Justice, concurring.

I do not believe that the balancing test used by the Court is an appropriate method of analysis with respect to the constitutional right of privacy. I doubt that the Court's balancing test is anything more than a requirement that all statutes be reasonable. Under the test, as used in the majority opinion, it must first be determined whether a questioned statute has a legitimate purpose. When that is done, the next question is whether the statute sufficiently furthers that purpose so that there is a rational[1] connection between means and ends. Once that question is affirmatively answered, as I view the test as applied here, the inquiry is in fact over and the statute is held constitutional. No real balancing is apparent.

Although I would not refer to it as balancing, the Court's method of analysis is an entirely appropriate one where the question is whether a given statute satisfies the requirements of due process of law. Due process does mandate that all legislation have a legitimate purpose and that there be a rational relationship between that purpose and the means used to further it. Our case of *Kingery v. Chapple*, 504 P.2d 831 (Alaska 1972) stands for that proposition. Since the due process command of reasonableness applies to all legislation regardless of whether individually enumerated constitutional rights are involved, it is illogical to impose no other test where express constitutional rights are present. Otherwise, there would be no purpose in expressing them.

The right to privacy is an express right under the Alaska Constitution.[2] If it is to be given the life it deserves by virtue of that position it should be defined and interpreted in our decisions. As each of the many separate categories of the right are present we should attempt to state in context what the right is and whether it applies to the case at hand.[3] We should not simply assume its existence, and then balance it away wherever it is confronted with a reasonable statute.

In my opinion the principle encompassed by the constitutional right of privacy which is germane to this case is "the general proposition that the authority of the state to exert control over the individual extends only to activities of the individual which affect others or the public at large as it relates to matters of public health or safety, or to provide for the general welfare." *Ravin v. State*, 537 P.2d 494, 509 (Alaska 1975) (footnote omitted).

---

**145.** In our analysis, we have emphasized the harmful effects of the drug, as we endeavored to ascertain whether the legislation could be sustained. Our over-all impression is that cocaine as presently used is less harmful to the health and welfare of society than opiates and also may be less harmful than barbiturates and amphetamines, alcohol and, as to physical harm, tobacco. *See* discussion, *supra*.

**1.** I use the word "rational" in the sense that it is used in *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976) meaning "reasonable, not arbitrary, and . . . having a fair and substan-

tial relation to the object of the legislation . . . ." *quoting State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973).

**2.** Article I, § 22 specifies, in part: "The right of the people to privacy is recognized and shall not be infringed."

**3.** Thomas Emerson, in his thorough and persuasive article, Toward a General Theory of the First Amendment, 72 Yale Law J. 877 (1963), advocates a similar process with regard to free speech.

John Stuart Mill in his essay *On Liberty* eloquently expressed this view:

> [T]here is a sphere of action in which society, as distinguished from the individual, has, if any, only an indirect interest: comprehending all that portion of a person's life and conduct which affects only himself or, if it also affects others, only with their free, voluntary, and undeceived consent and participation. When I say only himself, I mean directly and in the first instance; for whatever affects himself may affect others through himself; and the objection which may be grounded on this contingency will receive consideration in the sequel. This, then, is the appropriate region of human liberty. . . . [T]he principle requires liberty of tastes and pursuits, of framing the plan of our life to suit our own character, of doing as we like, subject to such consequences as may follow, without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong. . . .
>
> No society in which these liberties are not, on the whole, respected is free, whatever may be its form of government; and none is completely free in which they do not exist absolute and unqualified. The only freedom which deserves the name is that of pursuing our own good in our own way, so long as we do not attempt to deprive others of theirs or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily *or* mental and spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves than by compelling each to live as seems good to the rest.

Because, as explained in the opinion of the court, there is responsible authority which indicates that cocaine does sometimes cause anti-social behavior affecting the safety of others, I would hold that its use does not come within the right to privacy. I would not hold as the majority opinion does that cocaine use is a constitutionally protected activity and that such protection must give way to a reasonable statute.

While the results reached through the majority's balancing test and through the approach I suggest are the same in this case they will not be in all cases.[4] Balancing implies that legislators may overturn choices made by the framers of our constitution, as long as they do so reasonably. I cannot agree to that proposition.

---

4. A third approach would be to regard the right to privacy as fundamental and require the state to justify any intrusion with a showing of a compelling interest. We adopted this approach in *Gray v. State*, 525 P.2d 524 (Alaska 1974).